## HENRI CHOUTEAU v. MISSOURI-LINCOLN TRUST COMPANY, Appellant.

### Division One, October 9, 1925.

1. **CONTRACT OF SALE: Unaccepted Proposal: Variance in Terms by Oral Testimony.** A written proposal from the vendee to buy real estate, if not accepted by the vendor, does not constitute a complete contract, but if negotiations are continued which later result in a parole agreement to purchase, oral evidence is competent to show that a stipulation against further leasing of the premises by the vendor was embodied in the written proposal and carried forward by mutual promises into the consummated parole agreement.

2. ———: ———: ———: **Acquiescence in Written Terms: Presumption of Whole Contract.** Although certain terms of a contract to purchase the stock of a realty company owned by the vendor, a trust company, were dictated by the vendor's president to a stenographer, in the presence of the vendee, at a meeting of the vendor's board of directors and later incorporated in the minutes of the meeting, and from that fact the inference may be drawn that the vendee acquiesced in the terms so stated, no presumption can be drawn therefrom that they constituted the whole of the contract, and oral testimony is therefore competent to show that other terms were that no part of the building belonging to the realty company was to be leased, pending the negotiations, without the vendee's consent.

3. ———: **Oral Agreement: Preceding Stipulation Relating to Leases After Consummation.** Where all the terms of a contract for the purchase and sale of the stock of a real estate company had been agreed upon except the one relating to the security to be furnished by the plaintiff for the deferred payment, and its consummation was delayed under mutual promises that this part of it would again be taken up and threshed out and that in the meantime no leases would be made of the company's building, and the parole contract finally consummated grew out of the negotiations thus commenced and temporarily halted and then taken up where the parties left off,

and in the adjustments relating to the deferred payment the matter of making new leases was not mentioned, the antecedent stipulation relating to new leases continued and became a part of such final parole contract, and defendant is liable to plaintiff for damages resulting from a breach thereof by the making of new leases in violation of such stipulation. Such stipulation was in the nature of an express warranty, but it was not necessary that it should have been made simultaneously with the conclusion of the bargain.

4. ———: **Ultra Vires: Pleading.** The defense of *ultra vires* in a suit in which plaintiff seeks to recover damages resulting from defendant's breach of a stipulation not to lease the premises during the pendency of the negotiations for their purchase, in order to be available, must be pleaded.

5. ———: **Stipulation Not to Lease: Breach: Recovery from Holder of Stock of Lessor.** Damages sustained by the vendee of the stock of a real estate company, resulting from the leasing of a building pending the negotiations to purchase the stock, contrary to a stipulation not to lease, is recoverable from the defendant company, which was the owner of the stock of the real estate company, and had breached the warranty implied in the stipulation.

6. ———: ———: ———: **Measure of Damages.** Where a stipulation not to lease pending the negotiations to purchase real estate is breached, the measure of the vendee's damages is the difference between the rents provided for in the leases negotiated by the vendor and the reasonable rental value of the premises.

Corpus Juris-Cyc. References: **Appeal and Error:** 3 C. J., Section 1525, p. 1376, n. 63. **Corporations,** 14 C. J., Section 1062, p. 689, n. 12 New; Section 1094, p. 714, n. 15: 14a C. J., Section 2963, p. 841, n. 93. **Evidence,** 22 C. J., Section 1715, p. 1283, n. 93. **Sales,** 35 Cyc. p. 373, n. 47; p. 374, n. 52; p. 468, n. 7. **Trial,** 38 Cyc., p. 1710, n. 5.

Appeal from St. Louis City Circuit Court.—*Hon. H. A. Hamilton,* Judge.

A\ffirmed.

*Carter, Nortoni & Jones* for appellant.

(1) The petition in both counts declares upon the verbal promise alleged to have been made by Carter about March 12th and renewed over the telephone the

evening of March 21st, all of which was in connection with plaintiff's original proposition. This proposition not only fell of its own weight, but was abrogated after Carter's return from Denver about March 26th, when new negotiations were taken up. The court should have sustained our demurrers and directed a verdict for defendant because there was a total failure of proof as to a breach of the contract sued upon. Walker v. Bohannon, 243 Mo. 137; Ingerweson v. Railroad, 205 Mo. 335; Huston v. Taylor, 140 Mo. 25; Henning v. U. S. Ins. Co., 47 Mo. 425; Stix v. Matthews, 75 Mo. 91; Weil v. Poston, 77 Mo. 284; Clement v. Yates, 69 Mo. 623. (a) Plaintiff cannot sue on one cause of action and recover on another. Ingerweson v. Railroad, 205 Mo. 335; Sumner v. Rogers, 90 Mo. 324; Crawford v. Spencer, 36 Mo. App. 78; Clements v. Yates, 69 Mo. 623; Chitty v. Railroad, 162 Mo. 64. (b) The doctrine is that in such ciscumstances there is not a mere variance, but a total failure of proof within the meaning of our statute. Merryman v. Buddecke, 243 Mo. 216; Ingerweson v. Railroad, 205 Mo. 328; Coons v. Car Co., 203 Mo. 227; Laclede Const. Co. v. Tudor Iron Works, 169 Mo. 137; Ringer v. Holtzclaw, 112 Mo. 519; Huston v. Taylor, 252 Mo. 663; Lanitz v. King, 93 Mo. 517; Cole v. Armour, 154 Mo. 350; Michael v. Kennedy, 166 Mo. App. 466; Mt. Vernon Car Co. v. Hirsch Rolling Mills Co., 285 Mo. 669. (2) The original proposition of plaintiff and contract based thereon fell by its own weight and, furthermore, was, as the entire record shows, without dispute, rejected in fact. In such circumstances, or when a new term is added in the acceptance, the entire original proposal with all of its terms, parts and elements is abrogated and the field is open for new negotiations. State ex rel. Eq. Life Soc. v. Robertson, 191 S. W. 991; 13 C. J. sec. 86, p. 281; Chapin v. Cherry, 243 Mo. 401. When the proposition is rejected or fails or is in anywise varied by a counter-proposal, this, as a matter of law, operates as a rejection thereof, and both parties are free,

thereafter, and the field is reopened for new negotiations, and the terms of the contract, if eventually made, must be found in the words and the terms of such new negotiations. State ex rel. Eq. Life Soc. v. Robertson, 191 S. W. 989; Scott v. Davis, 141 Mo. 225; Eggers v. Nesbitt, 122 Mo. 675; Green v. Cole, 103 Mo. 76; Strange v. Crowley, 91 Mo. 295; Brunner v. Wheaton, 46 Mo. 366; Eads v. City Carondelet, 42 Mo. 117; Wallingford v. Ins. Co., 30 Mo. 52; Shickel v. Chouteau Harrison Co., 84 Mo. 161. (3) The terms of a valid written instrument cannot be varied or contradicted by parol evidence of contemporaneous or prior oral agreement, because all such contemporaneous or prior agreements are merged in the written contract and cannot be permitted to vary its unambiguous terms. Behart v. Meyers, 240 Mo. 76; Tracy v. Union Iron Works, 103 Mo. 193; Spellman v. Balinat, 187 Mo. App. 125; Shickel v. Chouteau Harrison Co., 10 Mo. App. 246, 84 Mo. 163; Crim v. Crim, 162 Mo. 544; St. Louis Ry. Co. v. Cleary, 77 Mo. 634; Johnson v. Life Ins. Co., 93 Mo. App. 590. (4) Both the evidence admitted on the question of damages and the recovery of damages awarded by the jury under the instructions given were purely speculative and therefore not recoverable. Weber Imp. Co. v. Acme Machine Co., 268 Mo. 363; Taylor v. McGuire, 13 Mo. 515, 12 Mo. 313; Calloway Mining Co. v. Clark, 32 Mo. 305; Connoble v. Clark, 38 Mo. App. 488. (a) In a case somewhat similar to this, where the plaintiff owned all of the stock in a mill corporation and sued his proposed partners for breach of contract, whereby a new corporation was to be formed to take over his stock in the mill property, is Camp v. Gress, 250 U. S. 319, 63 L. Ed. 1004. (b) Although plaintiff as a stockholder may have sustained a loss, the loss was to the corporation in which he owned the stock, that is, International Building Company, in that such corporation is an entity distinct from its stockholders and the loss of rental is a loss to the corporation. Watson v. Bonfils, 116 Fed. 157; Cumings v. Parker, 250

Mo. 427.  (5)   That the contract sued upon is *ultra vires* the defendant corporation must be conceded, according to all of the decided cases.   Hunter v. Garenflo, 246 Mo. 135; Anglo-American Land Co. v. Trust Co., 132 Fed. 721; Hanlon Millinery Co. v. Trust Co., 251 Mo. 553; State ex rel. Hadley v. Banker's Tr. Co., 157 Mo. App. 557.; State ex inf. Crow v. Lincoln Trust Co., 144 Mo. 587.

*H. Chouteau Dyer* for respondent.

(1)   The contract pleaded and relied on, and for the breach of which this action was brought, was an oral contract.   It was the culmination of the negotiations begun when the defendant's agent first solicited the plaintiff, a few days prior to March 12th, and completed on or about April 1st.   There was no point of time during the aforesaid negotiations when the minds of the parties met until the agreement was reached which resulted in the contract on or about April 1st.   (2)   Even if the option signed by the plaintiff on March 13th could by any means be construed to be a written contract, the inducements which caused plaintiff to enter into this contract, and upon which he relied, were clearly admissible in evidence as being a part of the whole contract.   Bowers v. Bell, 193 Mo. App. 210; Owsley v. Jackson, 163 Mo. App. 11; Brown v. Bowen, 90 Mo. 184; Bannerman v. White, 10 C. B. (N. S.) 844, 857; Alexander v. Righter, 240 Pa. St. 22; Am. Bldg. & Loan Assn. v. Dahl, 54 Minn. 355; Boggs v. Laundry Co., 171 Mo. 290; Ware v. Allen, 128 U. S. 590; Burke v. Dulaney, 153 U. S. 228; 2 Williston on Contracts, sec. 642.   (3)   The evidence offered and admitted on the question of damages was properly admitted under all the circumstances and was the best evidence.   The opinions of expert witnesses were clearly admissible, and under the circumstances the best evidence.   2 Sutherland on Damages (4 Ed.) sec. 444, p. 1433; 2 Jones on Evidence, sec. 388, pp. 961-962; Miller v. Smith, 112 Mass. 470.; Pickens v. Boom Co., 58 W.

Va. 11. The true rule of damages is the difference between the rent provided for in the leases negotiated and executed by the defendant and the reasonable rental value of the premises. Hughes v. Hood, 50 Mo. 350; Ordelheide v. Traube, 183 Mo. App. 363; Hammond v. Beeson, 112 Mo. 200; Gildersleeve v. Overstoltz, 90 Mo. App. 530; Chapman v. Kirby, 49 Ill. 211. "The evidence of the damages suffered was not speculative." Hendrix v. Railway, 107 Mo. App. 127. As far as the question of damages is concerned, the plaintiff and the corporation are one and the same. Hax Bros. v. Hax, 84 Mo. App. 315; Kimmel v. Stoner, 18 Pa. St. 155; Fleming v. Reed, 77 N. J. L. 563; Butts v. Wood, 37 N. Y. 317; Foss v. Harbottle, 2 Hare, 492. (4) The question of *ultra vires* not having been pleaded in the answer as a defense— the answer being a mere general denial—is not properly before the court. Hanlon Millinery Co. v. Miss. Valley Tr. Co., 251 Mo. 533.

RAGLAND, P. J.—This is an action for damages alleged to have resulted from the breach of a stipulation embraced within and forming a part of a contract of sale. With respect to the facts, which are comparatively simple, the evidence presents no essential conflict. In March, 1920, the defendant, Missouri-Lincoln Trust Company, was engaged in winding up its affairs. Among other assets it owned 5,575 shares of the authorized and outstanding capital stock of the International Building Company, a corporation organized and existing under the laws of this State. The sole asset of this corporation was a seventeen-story office building, known as the International Life Building, located at the southeast corner of Eighth and Chestnut streets in the city of St. Louis, and the leasehold upon which the building stood. The property was encumbered by a deed of trust or mortgage which secured a bonded indebtedness at that time of $268,000. W. Frank Carter was president of both the defendant corporation and the International

Building Company. The board of directors of the latter were selected entirely from the directorate of the former.

In February, 1920, Mr. Carter commissioned one Gregg to sell the International Life Building and lease-hold. Pursuant to such authorization Gregg opened negotiations with plaintiff. During the course of the negotiations he exhibited to plaintiff and gave him a copy of a written statement which had been prepared from the books of the International Building Company and which set forth in detail both the gross income the building was yielding and the costs of its maintenance and operation. In connection with the former the names of the tenants were set out; the rental each was paying; and the date of the expiration of his lease. Having aroused plaintiff's interest in the matter of making the purchase Gregg introduced him to Carter, on March 12th or 13th. After an extended interview between them Carter dictated to his stenographer, and after it was transcribed plaintiff signed and delivered to Carter, the following document:

"International Building Company,

St. Louis, Mo.

"Gentlemen:

"Being desirous of acquiring the equity in the lease-hold located at the southeast corner of 8th and Chestnut streets, St. Louis, and the building erected thereon known as the International Life Building, I hereby make you the following proposition:

"I will give you two thousand dollars, check for which is herewith enclosed, for an option to buy either the equity in said leasehold for ninety-two thousand dollars or the entire stock of the International Building Company at that price, within thirty days from this date; and also to purchase seven thousand dollars of the International Building Company's bonds now owned by you, at the price of $95 and interest, and upon the following terms and conditions:.

"You are to install at your own cost and expense two boilers heretofore contracted to be installed and

you are to deliver to me either the stock above referred to or convey to me the leasehold free and clear of all indebtedness, except a mortgage securing a bond issue of which two hundred and sixty-eight thousand dollars is now outstanding. Payments for the above to be made by me in the following manner:

"Thirty thousand dollars in cash upon the delivery of the stock or conveyance of the leasehold, and the balance of sixty-six thousand, six hundred and fifty dollars, by a note for that amount payable on or before five years from date, with proper interest notes attached covering interest at the rate of six per cent per annum, secured by a first deed of trust on five hundred eighty acres of land, more or less, situate in St. Louis County and known as St. Vrain Farm, which I represent to be worth at least one hundred and sixteen thousand dollars and which representation, if found to be excessive shall invalidate this option and the deposit of two thousand dollars shall be returned to me. In the event the value of the farm is acceptable to the International Building Company, and I do not carry out the terms of this option, then I am to forfeit the two thousand dollars deposited by me.

"This deal to be closed as of April 1st, 1920, and all taxes, insurance, interest, ground rent and rentals from building to be adjusted as of that date. All supplies and materials on hand and necessary in the operation of the building shall be conveyed under the terms of this option.

"I understand that the Missouri-Lincoln Trust Company is the owner of fifty-five hundred and seventy-five shares of the total outstanding issue of the stock of the International Building Company. I am to have the option to buy the fifty-five hundred and seventy-five shares owned by the Missouri-Lincoln Trust Company at the same ratable price per share, to-wit, fifteen dollars and sixty-five cents per share, under the same conditions as above set out, in which event the note above referred to shall be reduced in the sum of six thousand six hundred and fifty-seven dollars.

"Yours very truly, HENRI CHOUTEAU."

In the course of the interview at which the terms of the proposed sale were being considered and discussed and which was concluded by the dictation and signing of the document above set out, Carter told plaintiff that for $92,000 he would either have the International Building Company convey to him the equity in the building and leasehold, or else have the defendant company transfer to him the entire issue of the capital stock of the building company—whichever worked out the easiest. And plaintiff indicated that either method of making the transfer of the title to the building and lease would be acceptable to him. Plaintiff took to the interview the copy of the statement showing the condition of the building as to rentals and cost of operation which had been furnished him by Gregg, and in the course of the conversation, according to his testimony, he said to Carter: "Will you see that no further leases are made?" and Carter replied: "I will see that no further leases are made." With respect to the same matter Carter testified: "Mr. Chouteau said to me: 'Well, you won't put any more leases on there without my knowledge,' and . . . I said to him: 'There will be no leases executed on that property that won't be submitted to you first.' "

Plaintiff's written offer was submitted to the board of directors of the defendant company at a special meeting held on March 16, 1920. The board's action with respect thereto is shown by the following excerpts from the minutes of the meeting:

"Upon motion duly made and seconded the officers of this company were authorized to sell 5,575 shares of stock of the International Building Company now owned by this company on the terms contained in the letter of Henri Chouteau, dated March 15, 1920, copy of which is as follows—provided the officers of this Company ascertain that the value of the land referred to is at least $100,000.00.

310 Mo. Sup.—43.

"Upon motion duly made and seconded it was recommended to the directors of the International Building Company that they sell the leasehold on which the International Life Building is located, at the Southeast corner of Eighth & Chestnut Streets, St. Louis, Mo., on the terms named in the letter of Henri Chouteau above referred to, and on the same conditions."

On Sunday, March 21, 1920, Carter accompanied by two experts on real estate value went to the St. Vrain farm and viewed it for the purpose of making an appraisal. That night plaintiff called Carter over the telephone to ascertain what conclusion the latter had reached as to the value of the land. The substance of the conversation that ensued as testified to by plaintiff was as follows:

"Their appraisal was a trifle less than mine, and I called him up, I think that Sunday night, and asked him about it and he said he didn't think that was quite enough to put up, and I suggested I could raise a little more money, and he said, Well, they would thresh that out and fix that up, and I mentioned about the leases again at that time, but being as he was president of the company, and after him telling me once that he wouldn't make any more leases I thought that settled the matter.

"I called up Mr. Carter and asked him how things were progressing, and he said, 'Not so well,' or words to that effect. I said, 'Well, we will take care of any little difference.' I said 'Be sure, no leases are made,' and that is when he kind of got a little short, as if I was questioning his word.

"Q. What did he say? A. He said 'No.' "

With reference to the conversation over the telephone and the condition in which it left the negotiations, Carter testified:

"Mr. Gregg called me up that Sunday evening. I was leaving for Denver. I think perhaps Mr. Chouteau had previously called me up; I am not certain of that. I know Mr. Gregg called me up and asked about the deal, and I told him the deal couldn't go through; that I didn't find

the value in the farm that justified a loan of the size that the proposition contemplated, and that our board of directors, in my judgment, wouldn't accept it, and either Chouteau or Gregg asked me what they could say or do, and I told them I was going to Denver that night, and that 'there is nothing can be done until there is a different proposition made.' . . .

"Q. And then was there anything else transpired between you and Mr. Chouteau on that occasion? A. Chouteau said naturally, 'Can't I submit another proposition?' and I said then, 'I will call a meeting of the board,' and I called a meeting for April 2nd, and Mr. Chouteau and Gregg were present at that meeting and they submitted the proposition which is a matter of record.

"I told him (Chouteau) the deal couldn't go through in that shape . . . .

"When he called me up that Sunday evening, he or Gregg, I told him I was leaving for Denver that night and would be back Tuesday or Friday of that week. When I returned the matter stood as we had left it, and we took it up where we had left off and I called a meeting of the board at which he made this verbal proposition.

"Q. You didn't say anything to him on the evening of this Sunday when he called you up, and you informed him of your conclusions as to the value of the farm over the telephone, about returning to him the check? A. No, sir; no mention was made of it.

"Q. And on your return the negotiations were continued, and you continued to hold the $2,000, or the check? A. Yes, sir.

"Q. And in your resolution, or the statement of the terms which were put in motion by Mr. Waldheim and duly second and carried by the directors of the Missouri-Lincoln Trust Company, it is recited as follows: 'In payment of the obligation above assumed, said Chouteau, having already made payment of $2,000 as earnest money, agrees upon the conclusion of this contract to make a cash payment of $30,000.' That was the $2,000 that was

deposited as earnest money payment to bind the bargain? A. Yes, sir.''

There was no denial by Carter that in the telephone conversation just referred to he renewed his assurance to plaintiff that no new leases would be made.

Upon Carter's return from Denver on March 26th or 27th the negotiations between him and plaintiff were immediately resumed, with the result that an agreement was speedily reached. The agreement so concluded was not reduced to writing, but the following was dictated by Carter at a meeting of the defendant's board of directors held April 2nd, in plaintiff's presence and subsequently incorporated in the minutes of the meeting:

"First. Said Chouteau agrees to pay ninety-two thousand dollars for all of the stock of the said Building Company, being 6,000 shares of the par value of $50 each; said price being $15.33 per share. It being understood that of said 6,000 shares the Missouri-Lincoln Trust Company owns 5575 shares and will endeavor to purchase from the owners the remaining 425 shares, but in the event they cannot purchase all of the 425 shares, there is to be returned to said Chouteau $15.33 for each share outstanding and unpurchased under this agreement, on the 1st day of June, 1920.

"Second. Said Chouteau agrees to purchase from the Missouri-Lincoln Trust Company bonds of the International Building Company having a face value of $7,000 and to pay therefor 95 cents on the dollar plus the interest accrued up to the 1st day of April, 1920.

"Third. In payment of the obligation above assumed said Chouteau, having already made a payment of $2,000 as earnest money, agrees upon the conclusion of this contract to make a cash payment of $30,000, and to give his note dated April 1, 1920, for $10,000 due September first, 1920, secured by bonds of the International Building Company having a face value of $7,000, and further secured by Chicago & Western Indiana First Collateral Gold Trust notes in the amount of $5,000;

and a further note dated April 1, 1920, in the amount of
$56,650; due on or before sixty days from date, secured
by 5575 shares of the capital stock of the said Inter-
national Building Company.  Both of the notes above
mentioned are to draw interest at the rate of six per
cent per annum from date until paid.  . . .

"Sixth.  Upon the consummation of this contract
possession of the International Life Building is to be
turned over to said Chouteau according to the terms of
his proposition dated March 15, 1920, and thereafter all
adjustments of interest, and rents received and taxes
and other obligations incurred on account of the opera-
tion of the said building, are to be made as of April 1,
1920."

Pending the negotiations just detailed the vice-presi-
dent of the International Building Company, without the
knowledge or consent of either plaintiff or Carter, made
two new leases.  By one he leased to the National Lead
Company a large amount of office space (more than one
entire floor) in the International Life Building for a
term of two years, beginning June 1, 1920; by the other
he leased to the D'Arcy Advertising Company five rooms
for a term of four years and nine months to commence
May 1, 1920.  Plaintiff did not learn of the making of
these leases until after the sale of the stock had been
consummated and possession of the building had been
delivered to him.

Plaintiff's evidence tended to show that at the time
he was negotiating for the purchase of the International
Life Building the demand for office space in the city of
St. Louis was increasing and rents were accordingly ad-
vancing; and further, that the rents reserved in the
leases to the National Lead Company and the D'Arcy
Advertising Company were considerably less than the
reasonable rental value at that time of the space leased
under them.  Plaintiff testified that he would not have
bought the building if he had known that these leases
had been made; that in consummating the purchase of

the shares of stock through which the ownership of the building was acquired he relied upon the assurance given him that no new leases would be made without his approval. In this connection it should be said that the written statement given plaintiff by Gregg showed that the net income of the building, derived solely from rents, would not yield a return of one per cent on an investment of $92,000.

The petition was in two counts. Under the first a recovery of the damages alleged to have resulted from the leasing to the National Lead Company was sought; under the second the damages accruing from the giving of the lease to the D'Arcy Advertising Company. As to the substance of the petition it is sufficient to say that plaintiff's instruction presently to be noted was well within its allegations. The answer was a general denial.

The instruction just referred to, as applicable to the first count, was as follows:

"The court instructs the jury that if you find from the evidence that at or about the 13th day of March, 1920, the plaintiff and the defendant were negotiating for the purchase by the plaintiff and the sale by the defendant of the stock owned by the defendant in the International Building Company, and that the defendant exhibited to the plaintiff a memorandum or statement showing the existing tenancies and leases and expirations thereof of said building, and if you further find from the evidence that the plaintiff, with knowledge of such tenancies, leases and expirations, made a proposal to the defendant to purchase said stock, and that defendant agreed to consider said proposal; and if you further find that the defendant, by its president, promised and agreed that, pending negotiations for the purchase and sale of said stock no new leases would be made of the space in the building owned by said building company without the approval of plaintiff, and that thereupon and in reliance upon said promise and agreement, if you find that one was made by defendant, the plaintiff came to

an understanding with the defendant as to the purchase of said shares of stock and actually purchased and paid for the same; and if you further find that a lease was made for space in said building by the International Building Company to the National Lead Company while said negotiations were pending, without the approval or consent of the plaintiff; and if you further find that thereby plaintiff sustained loss and damage, your verdict will be for the plaintiff and against the defendant on the first count of the petition.

". . . If you find . . . for the plaintiff on the first count you will assess his damages in such sum as you may find from the evidence he, as a stockholder of the International Building Company, has sustained by reason of the making of the lease with the National Lead Company mentioned in the first count of the petition; and, in determining said loss you should deduct the total amount of the rental required to be paid by said lease under its terms from the total amount of what you may find from the evidence was the reasonable rental value of the space covered by said lease for the period of said lease, and allow the plaintiff such proportion of said sum, if any, as the amount of stock delivered to him by the Missouri-Lincoln Trust Company under the agreement mentioned in the evidence bears to the total amount of the outstanding stock of the International Building Company."

The second count was dealt with in precisely the same way. A verdict was returned for plaintiff in which his damages under the first count were assessed at $7980.80, and under the second count at $1908.23. From the judgment rendered thereon defendant prosecutes this appeal.

The principal grounds upon which appellant asks a reversal of the judgment are these: (1) oral evidence was admitted to contradict, vary and add to the terms of a written contract; (2) the proof failed to establish the contract pleaded, in this, that the evidence showed

that the negotiations in which the promise not to execute new leases was made failed and were wholly abandoned, and that in the negotiations subsequently entered upon which resulted in a contract of sale no such promise was made; (3) the undertaking on the part of defendant to prevent the International Building Company from making new leases was *ultra vires;* and (4) plaintiff's instruction on the measure of damages was erroneous.

I.  All of the evidence in regard to the stipulation that no new leases would be made with respect to the International Life Building pending the negotiations for the sale was objected to by defendant on the ground that it could serve no purpose except that of adding to or varying the terms of a written contract.

*Oral Testimony to Vary Terms.*

A most cursory view of the evidence, however, discloses that no written contract was ever entered into between plaintiff and defendant.  Following an interview with defendant's president, who was also president of the International Building Company, plaintiff addressed to the latter corporation a written offer to purchase all of its capital stock, or its building and leasehold. To this offer the International Building Company made no response.  Neither was it accepted by the defendant to whom it was not addressed.  On its being brought to the attention of the latter's board of directors, they merely adopted a resolution authorizing the defendant's officers to sell the stock it owned in the International Building Company "on the terms contained in the letter of Henri Chouteau," provided they found that the land named therein as security for the deferred payment was of a certain value.  When the contract for the purchase and sale of the stock was finally concluded between plaintiff and defendant it was not reduced to writing by the parties.  It is true that certain of its terms were dictated to a stenographer in plaintiff's presence by defendant's president at a meeting of its board of directors.  From

this fact an inference could properly be drawn that plaintiff acquiesced in the terms stated, but no presumption would arise therefrom that those terms constituted the whole of the contract. Presumably they were stated for purposes of the corporation's records; but in any event there was nothing in the situation to indicate that the parties were intending thereby to commit to writing all the terms of their agreement.

II.  There never was but one contract entered into between plaintiff and defendant, and that contract was never modified. As already pointed out plaintiff's written offer was never accepted and it became a mere incident in the progress of the negotiations which *Stipulation Continued from Prior Negotiation.* finally culminated in a contract. But the question raised under this head is: What were the negotiations which led to the making of the contract? Appellant's contention is that the negotiations which began on March 13th were definitely terminated on Sunday night, March 21st, when Carter told plaintiff that the St. Vrain farm was not of sufficient value to carry a loan of $66,000, and consequently that the negotiations had upon Carter's return from Denver were entirely distinct and independent of any that had theretofore taken place between the parties. The importance of this contention rests on the fact that the matter of making new leases was not mentioned between plaintiff and Carter after the latter's return from Denver.

It is unnecessary to repeat the evidence with reference to the state of the negotiations at the conclusion of the conversation between Carter and plaintiff on the Sunday night just before Carter left for Denver. It is sufficient to say that a jury would be fully warranted in finding from it that all the terms of a contract for the purchase and sale of the stock of the International Building Company had been agreed upon except the one relating to the security to be furnished by the vendee for the deferred payment; and that both Carter and plain-

tiff hung up the receivers of their telephones with the understanding that that matter would remain in abeyance until Carter's return from Denver when it would be "taken up and threshed out," and in the meantime no new leases would be made of any space in the International Life Building. And if so, the contract finally concluded grew out of negotiations which were commenced on March 12th or 13th and which were merely suspended during Carter's temporary absence. For upon Carter's return, to use his own language, "we took it up where we had left off." As a result, it was agreed that the part of the purchase price not to be paid in cash should be evidenced by two notes, one to be secured by the St. Vrain farm and the other by certain mortgage bonds, and thereupon the contract was completed.

Even if the negotations had after Carter's return from Denver be regarded as new and wholly independent of any other that had preceded them, still they were based on the antecedent stipulation made by Carter on the eve of his departure that no new leases would be made.

According to plaintiff's testimony he would not have bought the stock of the International Building Company if defendant had not promised that no new leases of space in the International Life Building would be made pending the negotiations. The sale finally affected was a sale of personal property. The stipulation that no new leases would be made was in the nature of an express warranty. It was not necessary that it should have been made simultaneously with the conclusion of the bargain. "If in fact the various negotations and acts in completion of the contract constitute but one transaction, a warranty given during the progress thereof will be valid, though some time elapsed between the warranty and the actual completion of the sale." [35 Cyc. 373 and cases cited in note 47.]

In view of the foregoing we conclude that there was ample evidence upon which to submit to the jury the question of whether defendant's promise to make no new

leases was a part of the contract finally effected, and consequently that the trial court properly denied defendant's request for a directed verdict.

III. The contention that the agreement that no new leases would be made by the International Building Company was *ulta vires* the defendant corporation has been elaborately briefed and argued. Such de-

Ultra Vires. fense, however, to have been available to defendant must have been pleaded. As that was not done we cannot consider it. [Hanlon Millinery Co. v. Trust Co., 251 Mo. 569; 5 Enc. Pl. & Pr. 96.]

IV. It is said that the loss, if any, resulting from the leases given to the National Lead Company and the D'Arcy Advertising Company was sustained by the International Building Company and is not therefore recoverable by the plaintiff who is but a stockholder in that corporation. This view is based on a misconception of the essential nature of the transaction had between plaintiff and defendant. The loss accruing to plaintiff was as vendee of the corporate stock and resulted from a breach of warranty on the part of defendant as vendor. The International Building Company was not a party to that contract, either directly or indirectly, and could not therefore suffer injury in a legal sense from its breach.

Further complaint is made that the damages assessed in accordance with plaintiff's instructions were necessarily speculative and conjectural. The instructions directed the jury to assess the damages at the difference between the rents provided for in the leases negotiated and the reasonable rental value of the premises. That such is the proper measure of damages in cases of this character is scarcely open to question. [Hughes v. Hood, 50 Mo. 350; Ordelheide v. Traube, 183 Mo. App. 363.] No question is raised as to the competency of the evidence which was offered to establish reasonable rental values.

It is finally urged that the trial court committed error in refusing instructions offered by the defendant.

The record does not afford a sufficient basis for the consideration of this assignment. Under the heading, "Defendant's Refused Instructions," follow nearly eight pages of printed matter in successive paragraphs but otherwise without subdivision or separation as to subject-matter. The paragraphs are not numbered. We are unable to tell from the record whether the whole was offered as one instruction, or whether there were separate offers of different parts of it. There are certain paragraphs which, if they had been offered as single instructions, should have been given, but we cannot assume they were so offered; nor can we convict the trial court of error in not separating the good from the bad.

As the record discloses no reversible errors the judgment of the trial court is affirmed.

*Graves* and *Atwood, JJ.,* concur; *Woodson, J.,* absent.