QUALITY WIG COMPANY, INC.,
Appellant-Respondent,

v.

J.C. NICHOLS COMPANY, INC.,
Respondent-Appellant.

No. WD 38004.

Missouri Court of Appeals,
Western District.

March 17, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 28, 1987.

Solbert M. Wasserstrom, Kansas City, for appellant-respondent.

Phillip J. Adams, Kansas City, for respondent-appellant.

Before CLARK, C.J., and TURNAGE and NUGENT, JJ.

CLARK, Chief Judge.

This dispute arises out of a mercantile lease of a retail storeroom and claims generated when the landlord undertook building alterations affecting the tenant's use of the leased premises. After a jury trial, the tenant recovered damages for breach of contract and misrepresentation. The landlord's counterclaim for rent was decided in favor of the tenant, but the landlord was given judgment for restitution of the premises. Both parties have appealed.

The history of the case begins with a lease dated September 30, 1975, under which Quality Wig rented a storeroom from the J.C. Nichols Co. in a shopping mall known as The Landing. For some four years thereafter, Quality Wig conducted its business of retail sales of women's hair fashion products, apparently without controversy and with modest success. In January, 1980, however, the J.C. Nichols Co. informed Quality Wig of plans to convert the mall area fronting the wig shop into rental space for another tenant and sought approval of the alteration. The consequence of the remodeling would have been to exclude the wig shop from mall access and to require wig shop customers to enter the store through an exterior door fronting on the parking lot. Quality Wig refused to agree because of the adverse effect on business.

During subsequent weeks, the parties continued in negotiations which would permit the remodeling but would recognize the rights of Quality Wig for the balance of its lease term then extending to October 31, 1980. It appears to have been conceded at the time that the proposed conversion of mall space into a rental area could not have been validly undertaken without breaching the Quality Wig lease, at least prior to

November 1, 1980. With this in view, the Nichols Co. advanced several proposals which culminated in an agreement made February 25, 1980.[1] Summarized, the agreement provided that Quality Wig consented to the appropriation by the Nichols Co. of the mall area and the tenant's right of access therefrom and in return, Quality Wig could occupy its current space rent free until December 31, 1980. At that time, if Quality Wig ceased business and vacated, it was entitled to receive a lump sum payment from the Nichols Co. of $5,000.00. Alternatively, if Quality Wig elected to remain in business, the Nichols Co. would make comparable sized space available in the center and would assist with the architectural layout and pay moving expenses. At the time this agreement was made, it is suggested by the evidence that Quality Wig management had various possibilities in view including a sale of the business.

After February, 1980, Quality Wig continued to do business at the original location, the mall conversion proceeded on schedule and wig customers used the parking lot entrance. As the year 1980 came to a close, a decision had apparently been made by Quality Wig to remain in business at the center. The parties negotiated a new lease dated February 11, 1981 for space identified as Room 1146 in another area of the center with mall access. On the basis of this prospective move, the Nichols Co. did not require possession of the original premises from Quality Wig on December 31, 1980 as the February, 1980 agreement had provided. Instead, Quality Wig continued in business at its original location paying no rent.

A significant feature of the February, 1981 lease was the affirmative representa-tion by the Nichols Co. that Room 1146 contained total gross leasable floor space of 538 square feet. As it later developed, however, this was incorrect. The Nichols Co. had used an outdated set of plans to compute the area. When Quality Wig, assisted by the architect, prepared plans for relocating the wig store fixtures, it was discovered that the space was substantially less than 538 square feet and was unacceptable for the wig shop. It is this discrepancy in the floor area which is at the heart of the Quality Wig claims for breach of contract and for negligent misrepresentation.

When the deficiency in space was revealed, the parties apparently reached an impasse. The Nichols Co. made no other space available and Quality Wig refused to move from its original shop or to pay any rent. On October 30, 1981, the Nichols Co. gave Quality Wig formal notice to vacate and this action by Quality Wig and the Nichols Co. counterclaim followed.[2] The jury returned verdicts for Quality Wig of $32,000.00 on the count for breach of contract and $10,800.00 on the count for negligent misrepresentation. The jury also refused to award the Nichols Co. a judgment for any unpaid rent.

## THE QUALITY WIG APPEAL

### I.

In its first point of error, Quality Wig contends its proof of damages was erroneously restricted because the trial court refused to admit evidence showing a prospective loss of business profits plaintiff would otherwise have enjoyed under the lease of the new store location for the term extending to 1991. The trial court did admit

---

1. For reasons which are unclear from the evidence, the Nichols Co. wrote three letters to Quality Wig, all dated February 22, 1980, each stating a different proposal for alternating circumstances. One letter bears a signature on behalf of Quality Wig accepting the proposals. We assume, as apparently do the parties, that the terms of all three letters constituted the agreement.

2. In its original form, the Quality Wig petition was in ten counts, but five counts were volun-tarily dismissed before trial. Of the five counts remaining, the trial court granted motions for directed verdicts in favor of the Nichols Co. as to three counts. The two counts submitted were for breach of contract and negligent mirepre-sentation, both based on the deficiency in floor area of the premises leased. No objection was made by the Nichols Co. to the possible duplici-ty of those counts. The counterclaim by the Nichols Co. was for rent and possession.

estimates of lost profits for the lease term to the date of trial, but not thereafter. As the subsequent discussion in this opinion will demonstrate, this decision by the trial court to admit part and reject part of the testimony of the expert witness raises two issues, one in the Quality Wig appeal and the other in the Nichols Co. cross-appeal. The first poses the question of what is the proper measure of damages in an action for breach of an agreement to lease. The second, considered in the Nichols Co. cross-appeal which challenges the ruling admitting some evidence of lost, anticipated profits, involves the limits on appellate review of a decision by the trial court to admit testimony by an expert witness.

The claim by Quality Wig was that the jury should have been entitled to award damages based on evidence showing what the business profits would have been had storeroom 1146 been as represented and had Quality Wig occupied those premises from February, 1981, for the lease term of ten years. To prove what those profits would have been, Quality Wig offered testimony by an expert witness, Roger Wayman, who prepared a trend-line forecast of profits to be generated at the new location through the lease term to February 10, 1991. The resulting loss was calculated by the witness to be $167,817.00. The trial court refused to admit evidence of prospective lost profits subsequent to the date of trial on the ground that the estimates were too speculative and uncertain of measurement.

■ It has long been the rule in Missouri, and in most other states, that the measure of damages for breach of a contract to lease is the difference between the rental value of the premises and the rent reserved in the lease. *Chouteau v. Missouri-Lincoln Trust Co.*, 310 Mo. 665, 276 S.W. 49, 54 (1925); Annot., 88 ALR2d 1024 (1963). Prospective future profits from a business to be established in the premises do not constitute an item of damages recoverable for breach of the agreement to lease because such damages are speculative, conjectural and subject to the uncertainties of changing future conditions. *Coonis v.*

*Rogers,* 429 S.W.2d 709, 714 (Mo.1968) citing *Anderson v. Abernathy,* 339 S.W.2d 817, 824 (Mo.1960).

Both the *Coonis* and *Anderson* cases note the existence of an exception to the rule barring recovery of anticipated profits in those situations where the loss is from the interruption of an established business and the plaintiff makes it reasonably certain by competent proof what was the amount of profits. Proof of income and expenses for a reasonable time anterior to the interruption is indispensible to show net profits. *Anderson, supra* at 824.

■ Quality Wig may not claim damages in the nature of lost profits here under the exception applicable to interruption of an established business because Quality Wig continued to conduct its business in the former premises, albeit by simply refusing to honor the Nichols Co. demand for possession. It is true that the business did not prosper after July, 1980, but the breach of the agreement to provide substitute space was a remote and not the proximate cause of the business decline. Quality Wig by its own evidence established that the cause of its losses was the mall alteration which limited access.

■ Quality Wig argues that the mall remodeling and the breach of the agreement to lease are essentially the same for purposes of damage causation and therefore anticipated profits were includable as items for the jury to consider. Even if that theory be accepted, however, the basis for Wayman's estimates of future profits did not meet the test of present data for a rational estimate of amount. It was undisputed that tax returns for the wig shop showed losses in the years 1974 and 1976 and profits of $7500.00 a year or less in the years 1975, 1977, 1978 and 1979. These calculations took no account of any value for the services of Christiane Hermstedt who managed the business and was the sole stockholder. Moreover, the store did not have a cash register or any journal of daily entry, only sales slips which were totaled periodically.

On the data stated, Wayman projected profits for the business to the year 1991 of

$11,000.00 per year, an amount greater than had been generated by the business in any former year. Wayman's projections depended in large measure not on the past history of the business but on a prediction that storeroom 1146 would have been a much more favorable location and that the business would improve in consequence of the move. Wayman's evidence was properly rejected because it consisted of rank speculation and was not based on the actual operations of the store in previous years.

The point discussed here is interrelated with a point raised in the Nichols Co. cross-appeal which argues not only that the trial court was correct in rejecting part of Wayman's testimony but that the ruling did not go far enough and should have sustained the objection to all of the witness's profit forecasts. Despite the fact that deficiencies in Wayman's data and methodology infected both pre-trial and post-trial estimates, the points on appeal arise in different contexts. The affirmance of the trial court ruling on the point of error brought by Quality Wig, and the apparently contradictory affirmance of the trial court on the point raised by the Nichols Co., discussed subsequently in this opinion, rest on different legal principles. It is enough to say as to the present point that the trial court correctly applied the general rule that prospective profits are not recoverable in a suit for damages for breach of an agreement to lease.

## II.

In its second point on appeal, Quality Wig contends the court erred in withdrawing from the jury's consideration testimony as to a proposed sale of appellant's business to one Ku and the instruction that damages were not allowable on account of the failure of that sale.

The evidence on the issue was that in 1980, Ms. Hermstedt conducted negotiations with Ku for a sale of the business. Ku was interested in the purchase only if the store were moved to a location inside the mall. He was shown the storeroom 1146 which later was the subject of the agreement to lease and expressed his opinion that the room was too small for the conduct of a wig business. The discussions never proceeded to any agreement and the sale was not consummated. Appellant contends it was entitled to submit to the jury a claim for damages based on the loss of profit which would otherwise have been realized from a sale to Ku.

The problem with appellant's argument is that negotiations between Hermstedt and Ku took place before the agreement to lease storeroom 1146 was made with the Nichols Co. Ku inspected the proposed location and pronounced it to be too small. When appellant entered into the lease with respondent, it knew the space identified in the lease, whatever its actual square foot content, was not acceptable to Ku. The proximate cause of the failure of the sale to Ku therefore was not the deficiency in square footage even if it be assumed that appellant believed storeroom 1146 was larger than it was.

Appellant argues that Ku would have purchased the business if arrangements had been made to enlarge storeroom 1146 by moving a partition wall some four feet. There was, however, no agreement made at any time enforceable against Ku on any terms binding him to purchase appellant's business. Whether he would have done so is no more than speculation and is, in any event, not a consequence of the breach of the agreement to lease. The withdrawal instruction was properly given to exclude this element of damage from the jury's consideration.

## III.

In its next point, Quality Wig argues that if it be denied recovery of anticipated profits as damages for the Nichols Co. breach of the agreement to lease, it should, as a substitute, be awarded specific performance of the lease agreement. The error complained of is the grant of a directed verdict in favor of the Nichols Co. on the petition count which sought specific performance.

It is to be noted that the Quality Wig claim is not that it be placed in possession of storeroom 1146 under the aborted lease,

but that the Nichols Co. be ordered to provide Quality Wig a room somewhere in the Landing Shopping Center which does contain 538 square feet. Whether any space meeting this requirement was or is available does not appear from the evidence presented.

█ The equitable remedy of specific performance is available only where a valid contract is in existence between the parties based on a clear mutual understanding and in terms sufficiently definite and certain to enable the court to decree its performance. *McKenna v. McKenna*, 607 S.W.2d 464, 467 (Mo.App.1980). Specific performance does not issue as a matter of course but only as a matter of grace, the grant of relief resting in the sound discretion of the court. *Lancaster v. Simmons*, 621 S.W.2d 935, 942 (Mo.App.1981). The court cannot make a contract for the parties and if the agreement sought to be enforced is indefinite, specific performance may not be decreed. *Gegg v. Kiefer*, 655 S.W.2d 834, 838 (Mo.App.1983).

█ In this case, the only agreement was the lease of storeroom 1146, space rejected by Quality Wig as unacceptable in size. It is true that the space content was misrepresented, albeit by mistake or carelessness, and for that, Quality Wig has its remedy in damages. From this, however, an agreement to provide substitute space elsewhere in the shopping center cannot be inferred or improvised. Once Quality Wig disavowed the lease to storeroom 1146, there was no agreement between the parties to be enforced and the remedy of specific performance did not lie.

█ There is an additional ground which supports the ruling. Quality Wig bases its claim of entitlement to specific performance on the ground that if it not be granted damages for loss of future profits, it cannot be made whole unless given storeroom premises of the size represented in the lease. In other words, Quality Wig asks specific performance as a substitute for the damage item of lost future profits.

In making this argument, Quality Wig does not offer to forego its judgment for damages awarded under the breach of contract and negligent misrepresentation counts. Those damages, despite the exclusion from consideration of the trend-line future profit, represent to some extent the value to Quality Wig of the promised leasehold. Thus, a grant of specific performance would to some undetermined extent award a dual recovery. In some instances, damages directly attributable to the delay in performance may be granted in addition to performance but they must be costs relating to affirmance of the subject matter of the decree. A purchaser may not, however, recover the value of the promised performance in addition to performance of the contract itself. *McDermott v. Burpo*, 663 S.W.2d 256, 263–64 (Mo.App.1983). On this ground as well as for the reasons previously discussed, the trial court did not err in directing a verdict for the Nichols Co. on the claim for specific performance.

### IV.

In a final point, Quality Wig argues that it was error to order the restoration to the Nichols Co. of the original storeroom in which Quality Wig had held over pending occupancy of other premises. Only the briefest of argument is made in support of the point and no authority is cited. We deem the point not worthy of discussion and consider it abandoned. *Wright v. Martin*, 674 S.W.2d 238, 242 (Mo.App.1984).

### THE NICHOLS CO. APPEAL

### I.

In its first point, the Nichols Co. contends the Quality Wig case for negligent misrepresentation failed and judgment should have been entered on its motion because the losses claimed as damages were not suffered in consequence of any misrepresentation made by the Nichols Co. We conclude that the point is valid and therefore reverse the judgment for Quality Wig as to its petition count III.

To place the issue in context, it is first necessary to summarize again the evidence submitted in support of the misrepresentation count consistent with the jury's verdict

for plaintiff. As of February, 1980, Quality Wig had the right to occupy the shopping center storeroom under its lease until October 31, 1980 in the then condition of the premises with mall access. It had the corresponding obligation to pay monthly rent of $475.00 and to vacate the property at the lease expiration. That situation was altered by the agreement of February 25, 1980, instigated by the Nichols Co. to accommodate its desire to increase the mall rental area. In exchange for consent by Quality Wig to the mall alteration, the Nichols Co. extended the wig shop lease term to December 31, 1980, waived payment of rent and agreed either to pay Quality Wig $5,000.00 if it closed its business and vacated or to provide comparable space elsewhere in the mall. Comparable space was defined as 538 square feet. Quality Wig ultimately chose the option of remaining in business but the substitute space provided was smaller in size than represented and was unsuitable. This fact was discovered by Quality Wig late in February, 1981.

During the period from July 1, 1980 to March 1, 1981, Quality Wig continued in business at its original location but suffered a decline in profits because of the lack of access to the mall. Anticipated profits lost on this account amounted to $10,715.00.[3] This is the amount claimed by Quality Wig as damages attributable to the negligent misrepresentation by the Nichols Co. of the size of the storeroom to be provided for relocation of the wig shop.

■ The cause of action for negligent misrepresentation includes the following elements: (1) the defendant supplied information in the course of his business; (2) because of a failure by defendant to exercise reasonable care, the information was false; (3) the information was provided by the defendant to the plaintiff in a particular business transaction, and; (4) plaintiff relied on the information and thereby suffered a pecuniary loss. *AAA Excavating, Inc. v. Francis Construction, Inc.,* 678 S.W.2d 889, 893 (Mo.App.1984).

■ For purposes of resolving the point, it may be accepted that Quality Wig's evidence satisfied the first three conditions quoted above. The question is whether Quality Wig's reliance on the representation resulted in the loss of profits as claimed. In this aspect, the jury in this case was instructed to return a verdict for Quality Wig if it found:

\* \* \* \* \* \*

"Fifth, plaintiff relied on the representation in remaining at 1100 E. Meyer Boulevard (the original storeroom location) between July 1, 1980 and February 28, 1981, and in so relying plaintiff was using ordinary care, and

Sixth, as a direct result of such representation plaintiff was damaged."

The problem with Quality Wig's claim for negligent misrepresentation is that the damages claimed did not result directly or indirectly from the deficiency in square foot floor area of storeroom 1146. As plaintiff repeatedly stressed, declining sales from the wig business after July 1, 1980 were the result of the mall remodeling which denied the store exposure to mall shoppers and required use of the exterior door from the parking lot. During this period, the size of the storeroom to be occupied after December 31, 1980, was irrelevant to the conduct of the wig business and did not influence profit or loss in any way. Quite apparently, Quality Wig remained at the 1100 E. Meyer location, first because the space was under a pre-existing lease effective until October 31, 1980 and thereafter, because the Nichols Co. waived payment of rent. The elements of the cause of action for negligent misrepresentation were not established in that plaintiff's reliance on the misrepresentation was not the proximate cause of the damage claimed.

■ The confusion which apparently vexed the trial court in dealing with plaintiff's multicount petition is attributable to the fact that Quality Wig had a cause of action for breach of contract which it un-

---

**3.** This sum involved the profits projected by witness Wayman under his admitted testimony

limited to the date of trial as discussed previously.

dertook to plead under a variety of theories, including the tort of negligent misrepresentation. The evidence, however, showed no damages attributable to the misrepresentation as such, but only damages generally recoverable for breach of contract. When the Nichols Co. did not provide a storeroom of adequate size to relocate the business of plaintiff, part of the consideration for the agreement by Quality Wig to the mall alteration failed. But for that agreement, Quality Wig would have been entitled to remain in its original storeroom with mall access. It therefore was entitled to recover from the Nichols Co. as an item of damages for breach of contract the business losses during the period it operated under the handicap of limited customer exposure. That cause of action was asserted in Count I and a substantial verdict was returned. The negligent misrepresentation count was, notwithstanding the failure of proof, duplicitous and should not have been submitted.

## II.

The Nichols Co. next argues that the court should have granted its motion for judgment on Count I, the breach of contract claim, because the storeroom it offered to Quality Wig substantially met the space representation of the agreement and even if not, Quality Wig knew or should have known before signing the lease in February, 1981, that the space was less than 538 square feet.

The witnesses who testified concerning the square foot floor area of storeroom 1146 were not in agreement as to how such measurement should be made. In consequence, the calculations varied, although none found the area to be as much as 538 square feet. By at least one computation, the area was 415.8 square feet.

The doctrine of substantial performance is usually applied in disputes involving building contracts. In those situations, it is held that literal and precise performance is not demanded and slight or trivial defects, imperfections or variations will not bar the action if the contractor has made an honest endeavor to comply and has sub-

stantially done so. *McAlpine Co. v. Graham,* 320 S.W.2d 951, 954 (Mo.App.1959). Thus, in *State v. Goodman,* 351 S.W.2d 763 (Mo. banc 1961), the court held a construction contractor entitled to recover the contract price, less debits for unfinished work on the ground of substantial performance because the school district had taken possession of and was using the building and the incompleted items were minor. Conversly, in *S.G. Adams Printing & Stationary Co. v. Central Hardware Co.,* 572 S.W.2d 625 (Mo.App.1978), the court found the contract to supply office modules not substantially completed and the seller not entitled to payment when the units were unfinished and desks were not usable.

■ The Nichols Co. contends here for use of the doctrine of substantial performance in a defensive posture, arguing that the variation between the size of storeroom 1146 and the square footage represented was not significant. It also asserts that the discrepancy was a matter of mistake and that in good faith, it believed the room to have been larger than it was. The problem with the point is that the Nichols Co. did have the opportunity to present the defense but lost because the jury decided the facts did not support the Nichols Co. position.

As was noted earlier, the evidence was markedly in conflict as to how many square feet were contained in Room 1146. Quality Wig protested vigorously that the room was absolutely unacceptable in size. The Nichols Co. offered and the court gave a jury instruction which required a verdict for the defendant on the breach of contract count if the jury believed the Nichols Co. had substantially performed its contract obligations. The jury decided the issue in favor of the plaintiff. Where the evidence on the issue of substantial compliance is disputed, the question is for the jury to decide. *Gundaker v. Templer,* 560 S.W.2d 306, 309 (Mo.App.1977) citing *Meyers v. Kilgen,* 160 S.W. 569, 572 (Mo.App.1913).

As to the claim of independent investigation and absence of a right to rely on the representation about the square foot area, the Nichols Co. is again dealing with an

area in which the evidence conflicted. Suffice it to say that there was evidence presented by plaintiff which, if believed by the jury, would support a finding that Quality Wig was unaware the storeroom did not contain 538 square feet until after the February, 1981 lease was signed.

### III.

In the next point of error, the Nichols Co. contends the trial court erred in failing to sustain its motion to withdraw the evidence of plaintiff's lost profits which were submitted as an item of damages. The point is closely aligned with the discussion of a similar subject under the first section of this opinion which considered the Quality Wig appeal, but with a difference. There, the anticipated losses were derived from a theoretical projection of business experience to the year 1991. Here, the time period was from 1980 to the date of trial and was therefore based in part on actual experience.

Wayman's factual basis for his opinion of anticipated profits for the more limited period of 1980 to 1985 was to some extent affected by the same infirmities discussed earlier in this opinion. His trend-line projection ignored some relevant data, there is a question as to whether the account information was complete or adequate for estimates at all and the actual experience in sales after July, 1980, was not fairly representative because the mall alteration made the location less desirable. These negative elements were, however, offset to some extent by the fact that economic conditions for the period in general were known permitting the evaluation of potential for profit in retrospect.

Disposition of this point may not be made on a parallel path with the decision on Point I of the Quality Wig appeal despite the similarity of the issues. The principal difference lies in the discretion to be accorded the trial judge's rulings and the marked differences between standards applicable to affirmance and reversal of the trial court on appeal. In deciding the Quality Wig point the decision was to affirm, a result not necessarily dependent on the basis stated by the judge for his ruling. To decide this point of the Nichols Co. appeal on the same ground results in a reversal and an invasion of the trial court's discretionary authority. The question is whether the facts justify that step.

It cannot be denied that when the court permitted introduction of evidence of lost profits to Quality Wig as an element of damages for breach of the contract to lease, there was a departure from the rule that generally the measure of damages is the economic value of the lease. Had the ruling been to exclude all such proof of lost profits, we would have affirmed, as was the disposition made in the first point of the Quality Wig appeal. Here, however, after considering all the circumstances, the trial court decided to admit some of the evidence limited to a time period ending as of the date of trial.

Apparently the trial court was persuaded that the uncertainty of future projections was overcome by limiting the period to that of actual experience and that the evidence Wayman presented was a valid opinion of actual damages Quality Wig had sustained. The question of whether the evidence was relevant was particularly one to be decided by the trial court in the exercise of its discretion because it was evidence by an expert witness whose qualifications were unchallenged. The general rule is that admission of expert testimony in a given situation is a matter to be determined by the trial court in the exercise of its sound discretion and the ruling will not be disturbed on appeal unless it plainly appears the trial court has abused that discretion. *Keller v. International Harvester Corp.*, 648 S.W.2d 584, 591–92 (Mo.App.1983).

The point asserted by the Nichols Co. that all of Wayman's testimony should have been excluded is not free from doubt. We are persuaded, however, that there was an arguable basis for admitting the testimony which was received and such being the case, we are unwilling to declare that the trial court abused its discretion. The point is therefore denied.

The Nichols Co. also complains of the admission of testimony by one Patton who managed another shopping center in which a wig store was located. Patton gave evidence as to sales from the wig store having increased from 1982 to 1985. The Nichols Co. claims the testimony was irrelevant. A foundation was laid for Patton's testimony which was based on his personal knowledge and upon evidence that the two wig stores were comparable. We find no error in receiving the testimony for such worth as the jury may have found.

## IV.

In its final point, the Nichols Co. argues that it should have been given judgment notwithstanding the verdict on its counterclaim for rent because there was no issue of fact for the jury and it was entitled to judgment as a matter of law.

The evidence, described earlier, was that under the February, 1980 agreement based on the three letters, Quality Wig was entitled to remain in the original storeroom rent free only until December 31, 1980. The evidence also was that in December, the Nichols Co. notified Quality Wig that rent charges would be reinstated commencing January 1, 1981. The countervailing evidence presented by Quality Wig was that one Fox, a Nichols employee, told Quality Wig in December, 1980, while discussions were underway about moving the store to the other location in the mall, that Quality Wig could remain in the original location without payment of rent until equivalent space could be located. By its verdict, the jury apparently believed this latter account.

The Nichols Co. contends Fox's statements and the reliance of Quality Wig on those statements could not vary the terms of the written agreement. The December, 1980 statement by Fox, if true, amounted to a modification of the February, 1980 agreement which was properly considered as evidence of the parties' understanding. *Tahan v. Garrick, Inc.,* 701 S.W.2d 189, 191 (Mo.App.1985). If the evidence was believed by the jury, it was sufficient to support the verdict denying the Nichols Co. recovery on its counterclaim.

The judgment on Count III of appellant's petition is reversed. The judgment is, in all other respects, affirmed. Costs are ordered divided equally between appellant and cross-appellant.

All concur.