Grace ANDERSON, Plaintiff-Respondent,

v.

Charles ABERNATHY and Erie Abernathy, husband and wife, Defendants-Appellants.

No. 48032.

Supreme Court of Missouri,

Division No. 1.

Nov. 14, 1960.

**818**

Clay Cantwell, Forsyth, for appellants.

Robert L. Gideon, Douglas Mahnkey, Forsyth, for respondent.

HOUSER, Commissioner.

The Circuit Court of Taney County decreed specific performance of an oral contract to sell Lot 5, Block B, Gateway Subdivision, in Taney County, and awarded plaintiff, Grace Anderson, $500 damages. On this appeal defendants Charles and Erie Abernathy, husband and wife, assert that the court erred in rendering the judgment and decree for plaintiff, for these reasons: (1) plaintiff failed to prove an oral contract to sell real estate, as alleged; (2) the action is barred by the Statute of Frauds, § 432.010 RSMo 1949, V.A.M.S.; (3) there was not sufficient evidence to take the case out of the operation of the Statute of Frauds; and (4) there was no proof of damages.

This being an action of an equitable nature this Court reviews the entire record and reaches its own conclusions as to the facts, determining the weight and value to be given the evidence. In this process we defer, when proper, to the findings of the trial court. Jones v. Linder, Mo.Sup., 247 S.W.2d 817.

Plaintiff and defendants' evidence on the question whether there was an oral contract to sell Lot 5 was diametrically opposed.

Plaintiff-Grace Anderson's testimony, corroborated by the testimony of Lorraine Wagner, her niece, and Ted Robinson, who operated a filling station in the subdivision, if believed, clearly established the existence of an oral agreement between Grace Anderson and Charles Abernathy (sister and brother) and Erie Abernathy, on or about July 1, 1957, by the terms of which the Abernathys not only sold Grace Anderson Lot 6 for $700, $25 down, balance later, but also at the same time agreed to sell Grace Anderson Lot 5 for $700, payment to be made for Lot 5 at the end of the business year, in the summer of 1958. The Abernathys categorically denied the existence of any agreement to sell Lot 5 and testified that the contract related only to the sale of Lot 6.

The following facts are conceded by all parties: In July, 1957 Grace Anderson, a married woman, was living in St. Louis, and Charles Abernathy and his wife Erie were

living in Taney County. Mr. Abernathy had purchased 80 acres of land in Taney County, which he subdivided and on which he had built a filling station and restaurant. About July 1, 1957 Mrs. Anderson and her niece Lorraine Wagner visited the Abernathys. Mrs. Anderson wanted to move to Taney County and go into business. They discussed the retail soft ice cream business, and Mrs. Anderson decided to establish and conduct such a business. Mr. Abernathy, who had lots for sale, offered to sell her land for the purpose. Mrs. Anderson and the Abernathys thereupon entered into an oral contract for the sale of Lot 6 of the subdivision, for a price of $700. Mrs. Anderson paid $25 that day, $275 on July 22, 1957 and $400 on August 17, 1957, following which she received a deed to Lot 6, duly executed by the Abernathys. Thereafter she and her brother discussed the erection of a building on Lot 6. Mrs. Anderson had plans for a building 24 x 34 feet in size. Mr. Abernathy agreed to oversee the erection of the building. He ordered the materials, and made all arrangements. He employed a carpenter whom he assisted, and the two, working together, built the building on Lot 6. One wall was located about three feet from the line dividing Lots 5 and 6. He was reimbursed by his sister for sums of money he advanced from time to time to pay materialmen. In December, 1957 or January, 1958, when construction of the building was completed, it was necessary for Mrs. Anderson to borrow $2,600 to pay the last of the bills for labor and lumber. Mr. Abernathy made the arrangements for the loan at a local bank. After the building was completed, Mr. Abernathy planned and laid out a system of driveways and culverts connecting both Lots 5 and 6 with the highway by two 30-foot driveways, a driveway and culvert on each lot. Mrs. Anderson testified that she put a culvert on Lot 5 because she thought and understood she "was goin' to buy it." The two driveways were separated by a flower bed which extended onto both lots. Mrs. Abernathy helped Mrs. Anderson put out the flowers in

the flower bed. Mr. Abernathy was overseer of the grading. He ordered and had the gravel hauled and supervised the installation of the culverts and the construction of the driveways. They were built in such a manner that both lots could be used together and jointly as a unit for driving and parking customers' automobiles. Mr. Abernathy did some of this work personally. Mrs. Anderson paid the bills, for grading, graveling, culverts and concrete, in the total amount of $376.57. A water pipe, purchased and installed by Mr. Abernathy and paid for by Mrs. Anderson, was laid from the Abernathy property to the ice cream building for the supply of water. With full knowledge and consent of the Abernathys, Mrs. Anderson entered into the possession of the building and of both Lots 5 and 6 and commenced the operation of the business on May 1, 1958. Lots 5 and 6 were used jointly. Disagreements occurred with respect to the use of the water, and on August 25, 1958 Mr. Abernathy cut the water line in two with a hack saw and refused to supply any more water to his sister. She carried water in five-gallon cans for awhile. Thereafter she bought a large tank and pump, and eventually drilled a well. In August, 1958 Mr. Abernathy erected a woven wire fence all along the division line between the two lots, thereby preventing Mrs. Anderson's customers from approaching or leaving the building over any part of Lot 5. On December 4, 1958 Mrs. Anderson sent the Abernathys a letter notifying them that she was "still ready and willing and able to complete our contract for the purchase by me of lot (5) * * *" and directing them to deliver a warranty deed to the People's Bank of Branson and received payment of the "agreed" consideration.

The Abernathys not having responded to this letter, Mrs. Anderson filed suit in three counts: I, for specific performance and damages; II, for a mandatory injunction requiring the Abernathys to furnish her with water, and for damages; and III, for the return of personal property of Mrs.

Anderson placed in the possession of the Abernathys, or damages for its detention. Mr. Abernathy filed a counterclaim in two counts: I, for $492 for labor and services rendered; II, for $20 for water supplied. Count III of the petition was dismissed on motion. The judgment and decree of the trial court found the issues for plaintiff, Grace Anderson, and against defendants, the Abernathys, on Count I of the petition, as indicated in the first sentence of this opinion, and against plaintiff and for defendants on Count II of the petition; and for defendant Charles Abernathy and against plaintiff Grace Anderson for $492 and $20, respectively, on Counts I and II of the counterclaim. Grace Anderson filed a motion for new trial with respect to Count II of her petition, but did not appeal when it was overruled. Charles and Erie Abernathy filed a motion for new trial with respect to Count I of the petition, and appealed when it was overruled.

Before elaborating on the points of difference between the parties, it should be pointed out that the Abernathys undertook to explain and justify Mrs. Anderson's possession and use of Lot 5 on the basis of an alleged permissive use. Mr. Abernathy testified that their first discussion with reference to Lot 5 occurred after the building was completed and the construction of the drives was started (which was in the spring of 1958); that he told her then that if she wanted to make improvements on Lot 5 "she could use it until I deeded it or sold it or called for it"; that there was no discussion about reimbursement of Mrs. Anderson for her expenditures on Lot 5; that he merely told her that if she wanted to make the improvements on Lot 5 she could use it, and she accepted the use of Lot 5 on those conditions; and that the first time he knew Mrs. Anderson wanted to buy Lot 5 was when he received her letter of December 4, 1958.

The Abernathys contended that Mrs. Anderson contracted for only one lot, Lot 6, with a 50-foot frontage. Mrs. Anderson testified that her brother had advised her that in this business she needed a 100-foot frontage in order to "make a circle around the place," and that he "laid out the plans" (on two 50-foot lots) for her; that he told her that with only one lot she would not have enough driveway and that one lot would be useless to her; that she "had to have the other lot * * *" and "had to have two lots to make the drive." Mrs. Anderson testified that she relied upon his superior knowledge and that she was convinced by his explanation. She further testified that she did not have the money in July, 1957 to pay for both lots, and that her brother knew that she could not afford to pay for both of them; that this was the reason he told her to pay for the one, "use her money on the building," and pay for the other after a year.

The Abernathys claimed that it was Lorraine Wagner who at the July 1, 1957 meeting was originally interested in Lot 5; that Lorraine "planned on takin'" Lots 4 and 5 but before giving her answer had to consult with her fiance in St. Louis, and that thereafter the Abernathys "held Lots 4 and 5 open" for 30 or 40 days. Both Lorraine Wagner and Mrs. Anderson denied that Lorraine had been interested in Lot 5.

The parties differed with respect to who made the decision as to where the building should be placed. Mrs. Anderson testified that "He told me where he was going to put it," and that she did not know that it was not "over on Lot 5" until she had it surveyed. Mr. Abernathy testified that his sister showed him where to put the building; that she wanted it near the east line of Lot 6 so that she would have a 25-foot driveway between the front of the building and the west line of Lot 6.

Mrs. Anderson attributed the final falling out to ill feeling on the part of the Abernathys caused by the fact that Mrs. Anderson gave Lorraine Wagner employment in the business when Lorraine left St. Louis and came to Taney County July 1, 1958; that Mrs. Anderson had employed

Mrs. Abernathy, paying her $1 an hour, when the business was first opened, but that after the niece arrived Mrs. Anderson no longer needed her. Mr. Abernathy testified that disagreements over the water bills and the use of the water brought on the difficulties. According to him there was no agreement with respect to water at the time the contract of sale was made; nor did they discuss water in August, 1957 when the deed was executed. He said that it was at the time the building was nearing completion that water was first discussed, and that he then gave his sister permission, at her own expense, to connect onto his water system temporarily but only until she could make arrangements for her own water system, and that she agreed to pay him $5 a month for water in the meantime. He testified that she paid nothing for water at any time, although he asked for payment several times; that she would become "very, very irritated" when he asked for payment; that she used water to excess and wasted water thereby reducing the pressure until at times his water supply was cut off. After warning her three times he finally cut off her water supply, not for nonpayment of water bills, but for "self-preservation," and in order to be able to meet his obligation to other water users whom he had agreed to supply. He denied that it was done "out of spite or madness," but on cross-examination admitted that he "could have been angry" when he cut it off. The state of his mind is revealed by his own account. One night when he found the water running at her place he turned off her supply. Next day he turned it back on. His sister then chided him, saying "I see we've got water. I knew you'd turn it back on. You had to. You was afraid not to." Mr. Abernathy, testifying, continued: "Well, gentlemen, I didn't wait to call my plumber. I took a hacksaw and cut it in two—sawed my pipe and did without water myself till I could get the plumbing fixed." According to Mrs. Anderson, when she contracted for the two lots Mr. Abernathy agreed to furnish water to her, without any limitation of time but she was to pay for the pipe. This was corroborated by Lorraine Wagner. Mrs. Anderson claimed that she was willing to pay for the water and offered to do so, but that her brother told her he would give her a bill later; that later he told her the bill "would be so high she couldn't pay it."

Mr. Abernathy testified that Mrs. Anderson agreed to "take care of" his time and pay him for his work; that he worked a total of 492 hours and that his time was worth $1 an hour. Mrs. Anderson testified that "when he went in there he wasn't going to charge me anything"; that as she was getting ready to settle the bills she asked what she owed him, and that he told her that she did not owe him anything because he was trying to "build up the corner" (of the subdivision), and that putting up the ice cream building "was as much to his benefit as it was to mine."

Mr. Abernathy testified that he erected the fence "over the water business"—"because of the water"; that when he asked for payment of the bills his sister said "There ain't nothing you can do about me using that lot. I'll use it, and there's nothing you can do about it," to which he responded, "Well, I think I'll do something about it." The "something" he did was to erect the fence. He testified that before he erected the fence he notified his sister that he wanted possession of Lot 5, but she denies this. Mrs. Anderson testified that after the fence was put up she said to Mr. Abernathy: "That lot's supposed to be mine; you know I'm supposed to buy that lot," and that he said it was his lot and all the money in the Branson banks couldn't buy it. Because of the fence people could not drive into her place, so she leased Lot 7 which adjoined Lot 6 on the west side (at a rental of $66 a year). She testified that customers will not drive their cars onto Lot 7, but tend to drive up to the building on Lot 6, and then back out onto the highway, which is dangerous.

Mrs. Anderson testified that when her brother shut off the water he told her to "Pack up her bags and move back to St. Louis." Mr. Abernathy denied this, but it was corroborated by Lorraine Wagner.

The Abernathys contend that no oral contract was proved; that the Statute of Frauds should be applied in this case; that the evidence was insufficient to take the case out of the operation of the statute, and that plaintiff readily may be placed in her original position by ordering the repayment to her of the sums she expended on Lot 5, and consequently no fraud upon plaintiff's rights is involved.

Mrs. Anderson contends that the evidence clearly establishes the existence of an oral contract; that the acts upon which she relies to take it out of the operation of the statute are consistent with the existence of the contract and were done with a direct view of its performance, so as to constitute part performance; that a fraud would be perpetrated upon her by enforcing the statute, and urges the Court to defer to the findings of the Chancellor.

■ On our review of the whole record we find that on or about July 1, 1957 the parties entered into an oral contract to sell Lot 5 for $700, payment to be made at the end of the business year, in the summer of 1958. While in arriving at this conclusion we defer to the findings of the Chancellor on the sharply conflicting evidence, we find the testimony of plaintiff and her witnesses altogether more satisfying, convincing and credible than that offered by the defendants. We are convinced beyond a reasonable doubt that the testimony given by them with reference to the existence, terms and conditions of the contract represent what actually happened. Their testimony is clear, cogent and explicit. The terms of the contract they establish are definite. Furthermore, plaintiff's testimony is corroborated, whereas defendants' version of the facts is uncorroborated. Plaintiff's testimony as to the existence and terms of the contract

is corroborated by her niece Lorraine Wagner. Their testimony with reference to Lot 5 is corroborated by the witness, Ted Robinson, a tenant of the defendants, who had two significant conversations with Mr. Abernathy. In the first, the latter told Mr. Robinson that he was "letting his sister have two lots there to put in this ice cream parlor." In the second, a conversation with reference to the driveway approaches, after a sketch was shown him Mr. Robinson suggested that Mr. Abernathy put in one or two driveways 60 feet wide (apparently instead of the 30-foot driveways planned), whereupon "Mr. Abernathy made the statement that he could only put in a 60-foot driveway for her *as she only had 100 feet."* (Emphasis ours.) The existence of an oral contract to sell Lot 5, in addition to the sale of Lot 6, is buttressed by the reasonable probabilities. It is more reasonable to believe and more probable that the Abernathys, who were in the subdivision business, offering lots and seeking to develop the corner, would attempt to sell plaintiff two lots than that they would try to sell one. (Mr. Abernathy conceded that at the time he agreed to her use of Lot 5 he "would gladly" have sold the lot.) It is more probable that in establishing a drive-in business plaintiff would desire and require the *fee simple title* to the adjoining lot, the use of which would become indispensable as the business thrived, rather than a mere permissive use, which might be withdrawn at any time. Finally, the credibility of Mr. Abernathy is seriously shaken by his ill-concealed and deep-seated animosity toward his sister, arising out of several wrongs which, whether real or fancied, Mr. Abernathy considered she had done him in connection with her use of his water supply, and her failure to pay him for the water used or for his labor and services.

■ The oral contract, the existence of which we confirm, was not barred by the Statute of Frauds. It was partly performed, by the taking of possession, so as to take the case out of the operation of the

statute, under the well-settled exception. "In the sale of land, possession by the vendee in pursuance of the contract of sale, without more, has been held to be sufficient part performance to take the case out of the operation of the statute of frauds. If the possession is accompanied by the erection of improvements upon the land, the courts in this state have always held the acts sufficient to take the contract out of the statute. [Citing numerous cases.]" Ross v. Alyea, Mo.Sup., 197 S.W. 268, loc. cit. 270. Not only did Mrs. Anderson take possession of Lot 5, and clear the weeds therefrom, but also she had it graded for use in conjunction with Lot 6, installed culverts connecting both lots to the highway, made improvements and spent money on Lot 5 for the use of both lots as a unit. After making these improvements she used Lot 5 for the purposes for which she had caused it to be adapted. There was no agreement for rent and no rent paid on Lot 5. At all times she claimed she had a contractual right to buy Lot 5. All of her acts in connection with Lot 5 were acts indicative of ownership and proprietorship. She treated it as her own. She treated it like she treated Lot 6. None of her acts of ownership was consistent with any reasonable theory of proprietorship on the part of the Abernathys, who, with full knowledge of what she was doing not only consented but actively assisted her in the exercise of dominion over Lot 5. In Hobbs v. Hicks, 320 Mo. 954, 8 S.W.2d 966, pursuant to an alleged oral contract, the vendee entered into possession of the land with the knowledge and consent of the vendors, cleared two acres and repaired the fences. In decreeing specific performance this Court said, 8 S.W.2d loc. cit. 969: "* * * after respondent took possession of the property, with the knowledge and consent of appellants, he made improvements on the property, treating it as he would treat his own estate; and such acts, in connection with the other evidence, justified specific performance. [Citing Pomeroy on Specific Performance of Contracts

(3d Ed.) § 126, and Scheerer v. Scheerer, 287 Mo. 92, 229 S.W. 192, loc. cit. 196, and other authorities.]" Furthermore, in accordance with the understanding of the Abernathys and Mrs. Anderson, the latter completed the erection of the ice cream building on adjoining Lot 6, an eventuality in which the former were interested, since it built up their subdivision. In Hayes v. Kansas City, Ft. S. & G. R. Co., 108 Mo. 544, 18 S.W. 1115, the question was the sufficiency of an alleged part performance to take an oral contract out of the operation of the statute. The agreement was to convey a lot to the railroad on condition that the company construct a sidetrack on the lot, and erect station buildings *on adjoining land*. The railroad constructed the sidetrack and the station buildings, graded the lot in question and spent approximately $300 macadamizing it. The railroad's acts under the facts in that case were held to show a possession and use by the vendee "wholly inconsistent with any proprietorship on the part of" the original lot owner, and that the oral agreement was sufficiently performed to take it out of the operation of the statute. We conclude that the acts performed by Mrs. Anderson with relation to Lot 5 were referable solely, exclusively and unmistakably to the contract sought to be enforced, under which Mrs. Anderson was entitled to get a deed to Lot 5, and were not reasonably referable to a contract for a mere permissive use; and that these acts were sufficient part performance to take the contract out of the statute.

■ To deprive plaintiff of the benefit of her contract would be unjust and inequitable. It would jeopardize the continued successful operation of plaintiff's business, and thereby impose an unnecessary hardship. Restitution would not be adequate, having regard to the needs of a modern drive-in business for adequate driving and parking space. This case calls for the intervention of a court of equity. Incidentally, the parties to be charged were

benefited, which is "a most important consideration in determining whether equity will intervene." Jones v. Linder, supra, 247 S.W.2d loc. cit. 825. The acts of part performance benefited them by contributing to the development and enhancement of the subdivision, thereby tending to make the unsold lots more desirable for business purposes.

Defendants' point that there was a failure of proof of damages must be sustained. The trial court found "the facts to be as alleged in Count 1 of Plaintiff's Petition except that the Plaintiff is damaged only to the extent of Five Hundred Dollars ($500)." (She had alleged damages of $5,000 for breach of the oral promise to convey, and $5,000 for loss of business and embarrassment.) Respondent in her brief opines that the trial court took into consideration "the damages caused by cutting off the water, by the building of the fence and the loss of business." No damages could have been awarded plaintiff under Count I for cutting off the water, because Count I did not seek damages for cutting off the water. The amounts spent by plaintiff for grading, graveling and culvert construction could not be awarded plaintiff as damages, because under the decree she will get the land and therefore will own and retain these improvements. No damages from the building of the fence or for the loss of business could have been included in the $500, because there was no evidence to sustain such an award. The only evidence of damage to her business was plaintiff's testimony that "the whole thing" including the cutting off of the water "affected our business very badly," and that she had lost business as a result of not having the use of Lot 5, in that school buses would not "pull in"; that if she had had room for the buses to enter the premises "I could've had more." She did not implement this conclusion with facts, however, and in another breath she testified that the business in the summer after the fence was built (1959) was "very good,"

was "twice as good," as her business in the summer before the fence was built (1958). "The general rule as to the recovery of anticipated profits of a commercial business is that they are too remote, speculative, and too dependent upon changing circumstances to warrant a judgment for their recovery. [Citing cases.] * * * They may be recovered only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount; and, when this is made to appear, they may be recoverable." Morrow v. Missouri Pac. Ry. Co., 140 Mo.App. 200, 123 S.W. 1034, loc. cit. 1038. There is a recognized exception to this rule in the case of an established business, in which case loss from interruption of the business may be recovered "where the plaintiff makes it reasonably certain by competent proof what was the amount of his profits." idem, 123 S.W., loc. cit. 1039, but proof of the income and expenses of the business for a reasonable time anterior to its interruption, with a consequent establishing of the net profits during the previous period, is indispensable. Fuchs v. Curran Carbonizing & Engineering Co., Mo.App., 279 S.W.2d 211. In the instant case there was no established business. In August, 1958, when the fence was erected, the business had been in operation only three or four months. It closed during the winter months. In any event, there was not sufficient proof of facts and data, as required by these cases. The general rule, which precludes the recovery of damages for loss of business, is applicable.

Accordingly, the judgment and decree of October 8, 1959 is reversed and the cause is remanded with directions to re-enter the same judgment and decree, as of October 8, 1959, except that the award of damages to plaintiff in Count I be omitted, thus ordering the same specific performance required by the original decree, but awarding plaintiff no damages in Count I.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.