HANDI CADDY, INC., Appellee,

v.

AMERICAN HOME PRODUCTS
CORPORATION, Appellant.

No. 76–1699.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 18, 1977.

Decided May 31, 1977.

Rehearing Denied June 9, 1977.

Thomas J. Wheatley, Kansas City, Mo., for appellant; Maurice J. O'Sullivan, Jr. and Stephen W. Jacobson, Kansas City, Mo., on brief.

David Skeer, Kansas City, Mo., for appellee; David R. Frensley and John F. Michaels, Kansas City, Mo., on brief.

Before CLARK, Associate Justice,* MATTHES, Senior Circuit Judge, and HEANEY, Circuit Judge.

MATTHES, Senior Circuit Judge.

This action was brought in the circuit court of Jackson County, Missouri by Handi Caddy, Inc. to recover damages for breach of contract. Defendant American Home Products Corp. removed the case to the United States District Court for the Western District of Missouri. That court on its own motion separated the issues of breach and damages. In the first trial a six-member jury found that defendant had breached the contract. Accordingly, an appropriate judgment was filed on October 16, 1975. The issue of damages was subsequently tried before the same judge and jury and a verdict was rendered awarding plaintiff $340,000 as damages for breach of contract. A judgment for that amount was filed on May 21, 1976. The district court denied defendant's motion for a judgment n. o. v.

or, in the alternative, for a new trial. Defendant then appealed from the judgment entered on the verdict for damages.

Defendant, a Delaware corporation with its principal place of business in New York City, was at all times material to this controversy engaged in the business of distributing food products, including frozen pizzas, under the trade name "Chef Boy-ar-dee." The pizzas were sold to wholesale grocers, frozen food distributors and chain store headquarters, but were not sold directly to retail grocery stores.

Plaintiff, a Missouri corporation, was engaged in manufacturing and distributing items fabricated from metal, including a device called a "Handi Caddy" oven utensil, which was designed to remove hot pizzas from the oven.

The parties engaged in negotiations for a promotion of Chef Boy-ar-dee frozen pizzas involving the distribution of the Handi Caddy oven utensils as premiums on a self-liquidating basis.[1] They then entered into a written contract dated April 1, 1970, which provided that for a period of fourteen months from May 1, 1970 to June 30, 1971, defendant would advertise plaintiff's product on its frozen pizza packages. The pertinent provision of the contract read as follows:

\* \* \* \* \* \*

2. Foods [defendant] will promptly after the execution of this Agreement, offer the oven utensils for sale to the public by means of copy on frozen pizza packages, point of purchase material and other media of Foods' choice. Said offer will provide that the customer may purchase one (1) Handi Caddy oven utensil if he fills out and returns a Coupon with one ($1.00) dollar to the listed post office box, as hereinafter set forth. Handi Caddy will be solely responsible for determining

---

* Associate Justice Tom C. Clark, United States Supreme Court (Ret.), sitting by designation.

1. A self-liquidating premium promotion is, in the words of defendant's expert witness, "a premium that is offered to the consumer at a price that includes the cost of the merchandise plus the postage and handling. \* \* \* The purpose of a self-liquidating premium promotion [from defendant's standpoint] is not to sell \* \* \* [premium] units. \* \* \* [Its] purpose \* \* \* is to give the sales force \* \* something to sell their dealers on."

the number of oven utensils necessary to satisfy its obligations under Paragraph 1 hereof.

Plaintiff offered evidence at trial to prove that while the contract provided for the term of the promotion to begin on May 1, 1970, the promotion did not actually begin until after that date. The first shipment of frozen pizza packages containing the Handi Caddy offer was made on June 30, 1970, but shipments did not generally begin until August from defendant's Pennsylvania plant and until September from its Indiana plant. The point of purchase material was not available to the sales force until June 23, 1970, and advertising in other media did not appear until May 2, 1971.

With respect to defendant's duty to advertise the promotion by means of copy on frozen pizza package point of purchase material and other media, plaintiff introduced the following evidence:

*Copy on frozen pizza packages.* Defendant's total production of frozen pizzas of all kinds and sizes for the contract period was 38,607,112. A reference of some sort to the Handi Caddy promotion was carried on 20,274,244 pizza packages. Of those 20,274,244 packages, 2,596,194 included a blurb on the front of the package which read "Get your pizza Handi Caddy—See back panel" and a picture illustrating the use of the Handi Caddy and an order blank on the back. Viewing the evidence in the light most favorable to the plaintiff, the maximum possible actual rate of response by the consumer to those packages was .17% (seventeen purchases per 10,000 packages). The remaining 17,678,050 packages included an order blank, but either failed to include pictures of the utensil showing how it was used, or failed to include reference to the promotion on the front of the package, or both. The rate of response to those packages containing no blurb on front, but with pictures on the back was .05% and for those packages containing no pictures, .025%.

*Point of purchase material.* Defendant made available to its sales force 10,000 channel cards and 50,000 tear off pads, each pad having twenty-five sheets, to be placed in supermarkets and other stores selling Chef Boy-ar-dee frozen pizzas. These materials were not made available until June 23, 1970, approximately three months after the promotion had been scheduled to begin. Furthermore, subsequent to June 23, 1970, the point of purchase material was present in some but not all retail stores selling Chef Boy-ar-dee frozen pizzas, and was not uniformly displayed in such stores. One hundred sixty-three Handi Caddies were sold in response to the tear off pads, a rate of response of .013%.

*Other media.* The only media support other than the advertising on the packaging and the point of purchase material was a split run advertisement in the May 2, 1971, Family Weekly Supplement to certain Sunday newspapers having a combined circulation of approximately 4,000,000. The advertisement appeared in every other Family Weekly Supplement, and consisted of a one-sentence reference to the Handi Caddy offer, without pictures or order blank, as part of a much larger advertisement for Chef Boy-ar-dee products.

The jury in response to special interrogatories submitted by plaintiff, found that defendant had breached the contract in the following respects:

1) the copy appearing on frozen pizza packages did not constitute a reasonable and substantial performance by defendant of the agreement;

2) defendant failed to reasonably and substantially provide point of purchase material promptly after execution of the agreement; and

3) defendant failed to offer the Handi Caddy for sale to the public by other media of its choice at a time and in a manner sufficient to constitute a reasonable and substantial performance of the agreement.

Defendant does not contest liability. It argues, *inter alia,* that the district court erred in allowing the jury to award damages on the basis of loss of profits, and that there was not substantial evidence to support the award of $340,000 in damages.

# I

## DAMAGES FOR LOSS OF PROFITS

Defendant argued at trial that because plaintiff was a new business,[2] which was engaged in producing an untried product and which had previously suffered business losses, the court should not have authorized the jury to award plaintiff any damages for what defendant terms "loss of gross profits." The district court was not persuaded by defendant's position and accordingly instructed the jury that if it found that plaintiff was damaged by the breach, it must award such sum as would compensate plaintiff "for the loss of whatever *net gain* plaintiff would have made by a fulfillment of the contract." (emphasis added).

■ We agree with the district court that under Missouri law there is no per se rule that a so-called "new" business may not, regardless of the facts and circumstances, recover for loss of net profits or net gain. The question of the recovery of lost profits has been the subject of much litigation. It is discussed in 22 Am.Jur.2d, *Damages* § 171, at 242, as follows:

> There are, however, three general principles which the courts apply to determine when lost profits will be allowed as compensation: (1) In both tort and contract actions, lost profits will be allowed only if their loss is proved with a reasonable degree of certainty. (2) In both contract and tort actions, lost profits will be allowed only if the court is satisfied that the wrongful act of the defendant caused the loss of profits. (3) In contract actions, lost profits will be allowed only if the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into.

(footnotes and citations omitted).

The Supreme Court of Missouri has held that while the general rule is that anticipated profits of a commercial business are too remote and speculative to warrant a judgment for their recovery, they may be recovered when "they are made reasonably certain by proof of actual facts, with data for a rational estimate of their amount". *Anderson v. Abernathy,* 339 S.W.2d 817, 824 (Mo.1960).

■ We recognize that a distinction is to be made between claims for profits derived from a new business venture and those derived from a going concern. A new business labors under a greater burden of proof in overcoming the general rule that evidence of expected profits is too speculative, uncertain, and remote to be considered and does not meet the legal standard of reasonable certainty. See 22 Am.Jur.2d, *Damages* § 173, at 245; *cf. LaBore v. Clark Oil & Refining Corp.,* 524 S.W.2d 183 (Mo.App. 1975); *United Iron Works, Inc. v. Twin City Ice & Creamery Co.,* 317 Mo. 125, 295 S.W. 109, 113 (1927); *Gray v. Wabash R. R.,* 220 Mo.App. 773, 277 S.W. 64 (1925). It does not follow, however, that a so-called "new" business can never recover lost profits as an item of damages for breach of contract. In the final analysis, the question is primarily a problem of proof. Each case must rest upon the evidence adduced and it is for the trial judge in the first instance to determine whether the complaining party has produced the quantum and quality of evidence sufficient to submit the issue to a jury.

We are not constrained to hold that the evidence was insufficient as a matter of law so as to require the court to direct a verdict for defendant on the issue of damages.

# II

## EXCESSIVENESS OF JURY VERDICT

Defendant also contends that "there is no substantial evidence to support an award of $340,000 as damages." For the reasons discussed *infra,* we agree.

In *Solomon Dehydrating Co. v. Guyton,* 294 F.2d 439, 447–48 (8th Cir.), *cert. denied,* 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192

---

2. Plaintiff was incorporated in March 1969, or about thirteen months before the subject contract was dated (April 1, 1970).

(1961), we held that inadequacy or excessiveness should be a matter for the trial court "and that we [would] consider review * * * not routinely and in every case, but only in those rare situations where we are pressed to conclude that there is 'plain injustice' or a 'monstrous' or 'shocking' result." We adhered to that standard in *Delores Taken Alive v. Litzau,* 551 F.2d 196, at 198 (8th Cir. 1977), and the cases cited therein, and in *Krall v. Crouch Brothers, Inc.,* 473 F.2d 717 (8th Cir. 1973). Other courts have established similar criteria. In *Machado v. States Marine-Isthmian Agency, Inc.,* 411 F.2d 584, 586 (5th Cir. 1969), for example, the Court of Appeals for the Fifth Circuit stated: "We can intervene only if the verdict is excessive as a matter of law and not merely as a matter of fact. The verdict must be so gross or inordinately large as to be contrary to right reason, * * *." In another case involving the excessiveness issue, the same court held that it is not the function of the appellate court to weigh conflicting evidence, judge the credibility of witnesses, and arrive at a conclusion opposite from one reached by the jury,

> * * * where there is a reasonable basis in the record for the jury's verdict. The scope of appellate review of a judgment entered on a jury's verdict is limited *but the Court owes a duty not as a mere automaton, but as a judicial function to determine whether there is really a rational basis for a jury's verdict.*

*Liberty Mutual Insurance Co. v. Falgoust,* 386 F.2d 248, 253 (5th Cir. 1967) (emphasis added).

We turn then to an analysis of the evidence, viewed in the light most favorable to the plaintiff, for the purpose of demonstrating that the verdict of $340,000 is not supported by the record, and that the award constitutes "plain injustice," is "monstrous," and produces a "shocking" result.

In addition to the evidence set forth above, plaintiff introduced evidence that defendant, prior to agreeing to the promotion, had conducted an in-home consumer test which consisted of questioning consumers before and after they used the Handi Caddy utensil. Forty-four consumers participated in the test. Before using the utensil, 34% indicated a definite interest in purchasing the Handi Caddy and 48% indicated a probable interest. After using the utensil, 31.8% indicated a definite interest and 38.6% a fair interest.

Plaintiff apparently recognized that it was confronted with a difficult task in proving damages based on its history of sales of the product in question. Being a relatively new enterprise, it could not offer a wealth of evidence of prior business experience in producing, promoting, and selling its product. Consequently, plaintiff was required to and did rely upon expert testimony in an effort to establish a basis for an award of damages.

Plaintiff's expert, in response to a hypothetical question, testified that, in view of the actual response rates and the results of the consumer test described above, if defendant had offered the Handi Caddy for sale to the public promptly after execution of the agreement by means of copy on the pizza packages which included a blurb on the front, an order blank, and pictures demonstrating the product's use on the back, and if defendant had promptly provided point of purchase material and had provided such material for the entire term of the promotion, in his opinion, a minimum response of 1% and conceivably as much as 2% would have occurred with respect to the pizza packages distributed during the fourteen month period. He further testified that had defendant also undertaken a reasonable and timely advertising campaign by other media of its choice, which in his opinion would include "local newspapers support, Sunday supplement support through the national circulation publications, like Family Weekly, plus local television and possibly radio," the response rate would have been 2 to 4%.

■ As we have noted, the cornerstone of plaintiff's proof of damages was the

expert's opinion testimony.[3] Plaintiff's only other significant proof consisted of the actual response rates, the results of the consumer survey, and a statement by the expert witness that the average response to self-liquidating premium promotions was 2%. In our view, in light of the Missouri law applicable to proof of lost profits, as set forth above, the expert's testimony that under more favorable advertising conditions response rates of from 100 in 10,000 to 400 in 10,000 could be expected is too speculative to support the damages awarded here. We reach this conclusion primarily on the basis of the evidence set forth above that the response rate to favorable package advertising when supplemented with appropriate point of purchase advertising was at most nineteen in 10,000.

We agree with defendant that there is a lack of sufficient probative evidence from which a jury could conclude that defendant was obligated to advertise the Handi Caddy offer on all pizza packages produced during the term of the contract. In our judgment, the contract itself is ambiguous with respect to this question. The district court entertained the same view and permitted evidence to resolve the ambiguity to be introduced by the parties; this evidence showed overwhelmingly that neither side intended the offer to be printed on all 38,-607,112 packages, but rather that the maximum contemplated by either side was 24,-000,000 packages. Correspondence between plaintiff's president and defendant indicated that the parties first discussed merchandising the unit with labels on at least three Chef Boy-ar-dee products. In February 1970, defendant informed plaintiff that the offer would be imprinted on approximately 12,000,000 packages. After plaintiff complained that defendant had at one time stated that the offer would be imprinted on 24,000,000 packages, defendant informed plaintiff on December 30, 1970, that it would imprint the offer on an additional 12,000,000 packages. The defendant in fact advertised on only 20,274,244 packages during the contract period.

We are left with the question of the appropriate method of correcting the error made below. Under 28 U.S.C. § 2106, we have the inherent power to set aside the judgment or to direct the entry of an appropriate judgment by way of remittitur. See *Wicks v. Henken*, 378 F.2d 395 (2d Cir. 1967); 6A Moore's Federal Practice ¶ 59.-05(3), at 59–48, 59–50 (2d ed. 1974). We are mindful of the reluctance of this court to interfere with the amount of damages awarded by a jury, whether it be in a tort action or one for breach of contract. We continue to subscribe to the teachings of *Solomon Dehydrating Co. v. Guyton, supra,* and interfere only where we "are pressed to conclude that there is 'plain injustice' or a 'monstrous' or 'shocking' result", *id.* at 448, and only when we are convinced that an assessment of the appropriate amount of damages may be made by this court on the basis of the evidence presented to the jury. Such is the case here. It is clear that defendant agreed to advertise on 24,000,000 packages. It is also clear that the maximum actual rate of response occurring with respect to package and point of purchase advertising under conditions plaintiff concedes were the most favorable it had reason to expect was .19%. While we agree with the expert witness that additional advertising as agreed upon in the contract could have doubled the response rate to the promotion, we think it reasonable to conclude only that the actual response rate of .19% would have doubled and therefore that damages should be computed on the basis of a .38% response rate. A response of .38% to 24,000,000 packages would have yielded a sale of 91,200 Handi Caddies. Plaintiff introduced evidence that its net gain on each sale was $.60, so that its net gain on the

---

**3.** Indeed, although we can of course only speculate, it appears that the jury's verdict is based upon acceptance of the expert's testimony that, had advertising been placed on both the front and back of all 38,607,112 pizzas sold, and had proper channel cards and tear-off advertising occurred, a response of between 1 to 2% would have occurred. When 38,607,112 is multiplied by 1½%, the total equals 579,106 units sold. This number, when multiplied by plaintiff's net profit of $.60 per unit, gives an amount very close to $340,000.

total would have been $54,720.00. On the basis of this analysis, we conclude that to permit the award of $340,000 to stand would constitute a windfall for plaintiff, a result which we are not inclined to condone.

Accordingly, we vacate the judgment and remand the case for a new trial on the issue of damages[4] unless plaintiff is willing to remit all damages in excess of $54,720.00. In the event such remittitur is made within ten days after the mandate is issued by this court, the judgment will be affirmed and plaintiff shall be allowed interest on the sum of $54,720.00 from the date of the original judgment of May 21, 1976. Each party shall bear its own costs for this appeal.

---

**4.** As we noted above, the trial was bifurcated, and the issues of liability and damages were tried separately. Defendant argues on this appeal that because the jury in the first trial did not decide (a) the number of packages on which defendant was obligated to advertise; (b) whether point of purchase material in the form of channel cards and tear off pads was to be displayed in all grocery stores during the entire contract period; or (c) whether defendant was obligated to employ multiple uses of other media of its choice, plaintiff should not have been permitted to introduce evidence on those issues as part of its proof of damages. We agree with the district court that such issues go to assessing the outer limits of liability—the amount of damages—and that since both trials were to the same jury, there was no basis for excluding such considerations from the jury.