483 F.Supp. 1094 (1979)
CARGILL, INC., Plaintiff,
v.
TAYLOR TOWING SERVICE, INC., a corporation, Defendant.
No. 77-1330A(1).
United States District Court, E. D. Missouri, E. D.
December 27, 1979.
*1095 P. Terence Crebs, Michael W. Forster, Gallop, Johnson, Godiner, Morganstern & Crebs, St. Louis, Mo., for plaintiff.
Elmer Price, Goldstein & Price, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, Chief Judge.
This matter is before the Court for a decision on the merits following a one-day bench trial held June 13, 1979. The action is an admiralty and maritime claim brought under the provisions of the Extension of Admiralty and Maritime Jurisdiction Act, 46 U.S.C. § 740, and is subject to the provisions of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff brought this action against defendant to recover damages it suffered as a result of the destruction of plaintiff's river dock facility by barge T-2008 then under the control of defendant's towboat, the M/V William Smith.
After consideration of the testimony adduced at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, the Court hereby makes and enters the following findings of fact and conclusions of law. Any finding of fact equally applicable as a conclusion of law is hereby adopted as such and conversely any conclusion of law applicable as a finding of fact is adopted as such.

Findings of Fact
1. Plaintiff is a Delaware corporation and is the owner of an elevator and river dock grain shipping facility situated adjacent to the right descending shore at mile 889.0 of the lower Mississippi River at New Madrid, Missouri. Cargill, Inc. is authorized to do, and does, business in the State of Missouri.
2. Defendant is a Missouri corporation and at all times relevant herein was the owner and operator of towboats on the Mississippi River and in New Madrid County, Missouri, including the vessel the M/V William Smith.
3. On January 9, 1976, the M/V William Smith was approximately nine years old and had two engines. On such day, one engine of the M/V William Smith was in need of repairs and the vessel was operating on one engine generating approximately two hundred and twenty five horsepower. When propelled by both engines, the *1096 aforesaid harbor tug generated a total of four hundred and fifty horsepower. This condition had existed for some time previously and was known to both plaintiff and defendant. The M/V William Smith had, in fact, been previously used in this condition to shift loaded grain barges from plaintiff's dock facility with plaintiff's knowledge.
4. On January 9, 1976, the M/V William Smith, pursuant to a radio call from plaintiff's facility, was directed to stabilize the loading of a grain barge and then remove the loaded grain barge from plaintiff's dock and take it to a fleeting area located approximately one-half mile upriver.
5. The M/V William Smith arrived at plaintiff's facility about 8:30 a. m. and stabilized the barge until it was fully loaded at approximately 1:30 p. m.
6. After barge T-2008 was fully loaded with grain, the pilot of the M/V William Smith, Fred Hartman, undertook to move it from plaintiff's facility to the upstream fleeting area. Paul Taylor told Hartman that Taylor would help Hartman move the barge if Taylor was able to get the M/V Billy Waxler operable in time to assist, but Taylor did not direct Hartman to wait for assistance before moving the loaded barge. After casting off from plaintiff's facility the M/V William Smith began pushing the barge upriver bow first. After the tug and barge had proceeded about one hundred and fifty yards upriver, Hartman lost control of the tow and the wind and current took control of the head of the tow shoving it towards the bank and the M/V William Smith did not have sufficient rudder power to maneuver with only one propeller to escape the conditions created by the wind and current.
7. The barge and tug were pushed back downriver and struck the number one and two upstream dolphins at plaintiff's facility about midship before becoming lodged against the marine conveyor. Because it was feared the M/V William Smith did not have sufficient power to turn the barge around, the M/V City of New Madrid was called in to help extricate the barge from plaintiff's marine conveyor.
8. There is no evidence to show that plaintiff's deckhand knew or had reason to know that the M/V William Smith operating on one engine had insufficient power to control a single barge.
9. Prior to the incident of January 9, 1976, plaintiff's facilities, including the first upstream H-beam batter pile dolphin and the pile cluster dolphin (mooring facilities) and the marine conveyor were in good and serviceable condition.
10. Subsequent to the collision, the two dolphins were knocked over completely so that they were no longer visible above the water line and the riverside and shoreside upstream legs and barge boarding platforms of the conveyor were damaged.
11. The reasonable costs of the materials and labors necessary to return plaintiff's facility to its original condition was sixty five thousand three hundred and sixty dollars. The Court has deducted from the estimate submitted by Southern Marine Construction Company the amount of twenty eight hundred dollars because of Mr. Frueh's testimony regarding the costs of driven fifteen inch pipe per foot and driven H-beams per foot in 1976.
12. As a direct result of the damage to plaintiff's dock facility by defendant, plaintiff was required to renegotiate certain January contracts for delivery of soybeans to February delivery to avoid default under the contracts. The carrying charges paid to the farmers and elevators by plaintiff are reasonable and the proof of such damages is clear. The Court finds such damages amount to seventeen thousand six hundred and eighty six dollars and seventy-one cents ($17,686.71).
13. Additionally, plaintiff claims damages for loss of "spot business". Spot business has been defined as a transaction in which the farmer-seller brings his soybeans to plaintiff's elevator and sells the load on the spot without prior negotiation. The only credible estimate as the percentage of plaintiff's spot business in soybeans was twenty per cent (20%).
*1097 14. Figures from which plaintiff's alleged spot business have been extrapolated are based upon projections made by plaintiff on a yearly, bi-monthly, and monthly basis. In this regard the Court notes that plaintiff has vacillated enormously in the amount claimed as damages for lost spot business while simultaneously contending that such amounts are not speculative.
15. The projections are for bushels (some projections are for soybean activity alone, another is for all types of grain) "put through". A "put through" bushel is one bushel taken into the facility and one bushel shipped out. Since by virtue of the damage to its marine loading facilities plaintiff was unable to unload grain from its storage tanks by use of its own conveyor, plaintiff's ability to purchase additional grain was limited to the amount of storage available on its grounds or reasonably available elsewhere. (But see finding 19, infra).
On the day of the accident, plaintiff had unused storage space of one hundred and fifteen thousand to one hundred and twenty thousand bushels of soybeans. Plaintiff continued to accept shipments on the following Monday through Thursday, amounting to approximately thirty five thousand bushels but apparently did not attempt to utilize the additional eighty thousand bushel capacity.
16. Plaintiff contends that the grains then being put through the facility were almost one hundred per cent soybeans, but in this Court's opinion that fact is far from established herein.
17. The soybeans which would have been delivered to plaintiff for spot sale could have been grown in the 1975 growing season, or in prior seasons and stored for sale in 1976. It can be advantageous for farmers to store the soybeans until after the first of the year subsequent to harvesting them for tax purposes, but certainly such a decision would not be inelastic with respect to the current and future price of soybeans.
In this regard, the Court considers plaintiff's Maumee, Ohio branch office manager's testimony that the country growers would simply come to plaintiff and commence "dumping that grain with little or no inquiry prior to dumping what he's going to get for that grain" a bit too harsh with respect to its estimation of a commercial grower's economic intelligence. One wonders why growers would store soybeans for an entire year if not motivated at least in part by price considerations. However, such a viewpoint would help to explain why plaintiff has been unable to identify a single person, elevator or other entity that came in, offered spot business, and was refused because plaintiff had insufficient storage space.
18. Plaintiff has not shown that the period in question was a financially advantageous period for growers to sell soybeans. Indeed, one of plaintiff's own witnesses testified that plaintiff might not have lost the typical growers spot business in that the grower might have returned (if he was initially turned away) at a future time to sell plaintiff the same soybeans. Compared to any of plaintiff's projections (even assuming a constant inaccuracy) the dramatically increased activity in months subsequent to the incident, especially in light of the twenty per cent estimate of spot business, indicates recapture of lost spot business.
19. Besides the inaccuracy of plaintiff's projections and the probable recapture of lost spot business this Court has great difficulty in accepting the twenty two day period claimed by plaintiff as down time from which lost spot business would be extrapolated.
Plaintiff did not merely restore the marine loading facilities to their pre-casualty condition, but rather, took the opportunity afforded to build a completely new and much more expensive dock. Plaintiff did not prove that though the facilities installed cost a great deal more, they took no more time to become operational than repair to pre-casualty condition would have taken.
Furthermore, plaintiff on February 4th and 5th, 1976, loaded three barges totaling one hundred and sixty thousand bushels of grain well before the time plaintiff claims *1098 its facility became "operational". Plaintiff has not shown why more extensive use of temporary loading facilities was impracticable or unreasonable.
20. In short, plaintiff's evidence on its alleged loss of profits relating to loss of spot business is speculative and unwarranted and such profits cannot be allowed by this Court under the applicable laws discussed in the conclusions of law hereafter.

Conclusions of Law
This Court has jurisdiction over the parties herein and has subject matter jurisdiction pursuant to 46 U.S.C. § 740, e. g., Hastings v. Mann, 340 F.2d 910, 911 (4th Cir. 1965), cert. denied, 380 U.S. 963, 85 S.Ct. 1106, 14 L.Ed.2d 153 (1965). The evidence in this case shows that an unseaworthy vessel owned and operated by defendant struck the stationary docking facilities of plaintiff. The M/V William Smith had insufficient power for the load which it undertook to move, a fact which was known to defendant, and the tug thereafter was unable to make headway against the wind and current of the Mississippi River. This condition proximately caused the damage to plaintiff's marine loading facilities. As such defendant's liability for the damage caused to the marine loading facilities is clearly established. Hendry Corp. v. Aircraft Vessels, 113 F.Supp. 198, 202 (E.D.La. 1953); see also Pacific Tow Boat Co. v. States Marine Corp. of Delaware, 276 F.2d 745, 750 (9th Cir. 1960); Patterson Oil Terminals v. The Port Covington, 109 F.Supp. 953, 954 (E.D.Pa.1952). In this regard, the Court finds that plaintiff is entitled to recover from defendant the sum of sixty five thousand three hundred and sixty dollars as the reasonable replacement cost of restoring the dock to its pre-casualty condition. Furthermore, the Court finds that the damage to the dock caused plaintiff to incur additional expenses of seventeen thousand six hundred and six dollars and seventy one cents to avoid default on delivery contracts for a period of one month. However, as to plaintiff's claim for alleged loss of profits due to loss of spot business, plaintiff's claim has not been adequately supported by credible evidence.
A federal court sitting in admiralty need not ascertain and apply the substantive law of the forum state. Spiller v. Lowe, 466 F.2d 903, 907-908 (8th Cir. 1972).
Damages for loss of use of a vessel, the closest analogy to plaintiff's marine loading facility, are often allowed under maritime law. See Gilmore & Black, The Law of Admiralty, §§ 7-19, p. 526 (2nd ed. 1975). While such damages are to be awarded on a net profit basis, it is unclear what evidentiary standard an admiralty court should apply in determining the burden of proof of loss.
Where clear precedents in maritime law are lacking, admiralty judges often look to the law prevailing on the land. Igneri v. Cie. de Transports Oceaniques, 323 F.2d 257, 259-260 (2nd Cir. 1963), cert. denied, 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1963); see also, Baggett v. Richardson, 473 F.2d 863, 864 (5th Cir. 1973); The Tungus v. Skovgaard, 358 U.S. 588, 594, 79 S.Ct. 503, 507, 3 L.Ed.2d 524 (1959).
The evidence presented does not present, by way of just and reasonable inference, an appropriate method for approximating the loss of spot business. Mills v. Murry, 472 S.W.2d 6, 16-17 (K.C. Mo.App. 1971); Handi Caddy, Inc. v. American Home Products, Inc., 557 F.2d 136, 140-141 (8th Cir. 1977); Connis v. Rogers, 429 S.W.2d 709, 714 (Mo.1968); John Deere Co. of St. Louis v. Short, 378 S.W.2d 496, 504 (Mo.1964); RED-E-GAS Co. v. Meadows, 360 S.W.2d 236, 240-241 (Spr. Mo.App. 1962). Because of the various factors discussed in findings of fact 14-19, supra, this Court cannot arrive at a reasonably accurate conclusion regarding the amount of loss, if indeed plaintiff experienced a loss of spot business. Fireside Marshmallow Co. v. Frank Quinlan Const. Co., 213 F.2d 16, 18-19 (8th Cir. 1954). With respect to the limitation of liability issue the Court finds that defendant is not entitled from limiting its liability under the facts of this case. Not only did the M/V William Smith lack *1099 sufficient power to properly handle the barge under the circumstances, Harbor Towing Corp. v. Parker, 171 F.2d 416, 418-419 (4th Cir. 1948), the Court further finds that defendant is not qualified under 46 U.S.C. § 183(a) by reason of lack of privity or knowledge. Furthermore, the Court does not believe that plaintiff was contributorily negligent in accepting the M/V William Smith and permitting defendant to take the barge out with one operational engine. Defendant had prior to that time made successful trips from plaintiff's facility with only one operational engine.
The final issue to be determined is the matter of prejudgment interest. This Court has decided to disallow pre-judgment interest because plaintiff has, in the opinion of the Court, unduly inflated its claim. Mid-America Transportation Co., Inc. v. Rose Barge Line, Inc., 477 F.2d 914, 916 (8th Cir. 1973). Judgment will be entered for plaintiff in the amount of Eighty Two Thousand Nine Hundred and Sixty Six Dollars and Seventy One Cents ($82,966.71).