Joseph **LOWDER** and Health Concerns, Inc., **Plaintiffs/Respondents,**

v.

**MISSOURI BAPTIST COLLEGE,** Defendant/Appellant.

No. 52928.

Missouri Court of Appeals, Eastern District, Division Four.

May 24, 1988.

Clyde C. Farris, Jr., Lashly, Baer & Hamel, P.C., St. Louis, for defendant/appellant.

Nancy S. Everett, St. Louis, for plaintiffs/respondents.

GRIMM, Judge.

In this jury tried case based on a contract, Missouri Baptist College appeals from the judgment in favor of Health Concerns, Inc. College raises three points on appeal. First, that the terms of the contract were too vague to constitute a contract as a matter of law. We disagree, because the evidence, when viewed in the light most favorable to the verdict, was sufficient to support the jury's finding of a contract. Second, that the trial court erred in allowing testimony of loss of anticipated profits because the testimony was without foundation and was speculative. We agree, because the testimony was based on inadequate and incomplete records; and further, did not include the expense of building a fitness trail. Third, that the trial court erred in permitting testimony about lost value as an ongoing business. We agree, because HCI had, at best, a one year contract with College and the actions of College did not destroy the business of HCI. Further, the evidence was insufficient to support the calculations of the loss. The judgment is reversed and remanded.

HCI's owner and operator is Dianne Meyer. She and Ken Morris, a College vice-president, had two meetings in May, 1983, to discuss generally the establishment of a health/fitness program at the college. Sometime before June 1, Meyer and Joe Lowder prepared a written proposal. Lowder, a friend and business associate of Meyer, had experience in running commercial fitness classes. The proposal was an expression of HCI's interest in discussing with the College, a means of locating on campus a complete health/fitness operation.

This proposal was given to Morris on June 1 and was discussed on June 9 at a meeting attended by Meyer, Lowder and Morris. On June 17, Lowder mailed a document to Morris entitled "Preliminary Notes Concerning the Agreement Between Health Concerns Inc. and Missouri Baptist College." In summary, its five paragraphs provided (1) HCI had the right to use an office, gymnasium, locker rooms, showers,

strength room, and a classroom; and if a conflict arose over use of the gym, HCI could use other space; (2) HCI was to construct a fitness trail, furnish equipment, offer programs for credit, furnish liability insurance, and advertise; (3) HCI was to have an option to renegotiate conditions of its operations on the College campus, if warranted, at the end of the fall term, 1983; (4) HCI was to have exclusive rights; and (5) College was to supply (a) parking space, (b) two phone lines through the switchboard; (c) use of facilities when school was not in session, (d) janitorial service, (e) security, and (f) advertising.

Sometime between June 17 and 22, Morris told Meyer that HCI was "a go" at the College. Morris also told her that he would set up a meeting with Dr. Patrick Copley, College president.

On June 22, Lowder met with Morris and Copley; Meyer did not attend this meeting. Morris briefed Copley on the contents of the June 1 proposal and the June 17 preliminary notes. Lowder testified that at the conclusion of this meeting, Copley said he had no qualms.

On June 29, Meyer picked up a letter from the college addressed "To Whom It May Concern." That letter said that HCI (1) had leased space from the college, (2) will be offering health/fitness programs, and (3) will provide exercise equipment, a fitness trail, and fitness classes to students, faculty, and staff. The letter also stated that classes would be offered for college credit and the college would include the program in its regular advertising. In mid July, Meyer and a friend obtained a bank loan for $8000 in order to purchase equipment.

At a college administrative council meeting after June 22 and before September 1, Paul Slates, business manager and a vice-president of the college, told the council about a new enterprise on campus. He said that an agreement with HCI had been reached and briefly described what they would do.

In August, Lowder and Meyer made preparations for starting the program. They had brochures printed, purchased floor mats, and ordered office supplies. In addition, they painted the walls in a room at the college that was to be their office. Also in August, Meyer checked the room that was to be renovated by the college for the weight equipment, and found that only minimal work had been done on it. In addition, she and Lowder were having difficulty getting into the gymnasium. She made numerous phone calls, but no one returned her calls. However, ultimately they did receive keys, as well as parking stickers for their cars.

On September 6, Meyer wrote Copley to make sure he knew what was going on. The letter told of plans to do some testing on September 10, with classes to begin September 12. Also, she advised Copley that if the gymnasium was busy, they would "use the alternative site of the chapel, as previously discussed." Copley came by and told her that the chapel could not be used.

On September 15, Lowder wrote a letter to the academic dean concerning the program. At the same time, he also wrote a letter to Slate, mentioning the facility problems they were having. On September 16, Meyer wrote Morris about several problems, including lack of specific assigned space for classes, janitorial services, and security. A response was not received.

On September 21, Meyer wrote Morris advising him that HCI was terminating its operation effective September 24. The letter indicated that "inadequate space and time in which to conduct our classes—or plan for growth—and the improbability that these factors can be overcome ... prompted our decision."

Before HCI left the college, nine people had enrolled; forty-five had expressed an interest. Evidence concerning prospective enrollment, and the use of Lowder's projections to estimate future profits and the value of HCI, will be discussed later.

■ On appeal, College asserts that "the terms of the alleged contract were too vague to constitute a contract as a matter of law in that there was no evidence as to the term of the agreement, the charges ...

and what space, if any, [HCI] could use when the gymnasium was being occupied."

In determining this question on appeal, we consider the evidence in the light most favorable to HCI, giving it the benefit of all favorable inferences arising from the evidence and disregarding College's evidence except insofar as it may aid HCI's case. *Shofler v. Jordan,* 284 S.W.2d 612 (Mo.App.S.D.1955).

As to the first part of the point that "there was no evidence as to the term of the agreement," Meyer testified that the agreement contemplated starting at the beginning of the fall semester in September, 1983. She went on to say that HCI was to conduct the program until the end of the summer session, which would be in July, 1984. The college did not offer any contradictory evidence. Exhibits received in evidence were supportive of this, referring to costs for one year memberships and use of the facilities between semesters.

As to the second part of the point relating to charges, Meyer said she and Morris discussed that college classes for credit would be offered at no charge to students. Although fees were to be charged for those using the facility for non-credit courses, she further stated that this information was shared with the college, and that no one had ever complained of the prices. HCI began offering classes as agreed and the amount of the charges was not objected to by the college.

The third part of the point concerned the space issue. HCI was to use the gymnasium. However, when it was not available, Meyer testified (1) that at the June 9 meeting with Morris, Morris said that HCI could use the chapel; and (2) on a tour of the campus a few days later, Slate and Morris both agreed that the "chapel [would] be the other space that would be used if we could not use the gym." Lowder testified to the same effect. The first time Meyer or Lowder knew that they couldn't use the chapel was when Copley told them that on September 6.

Since there was sufficient evidence to support the jury's finding of an agreement between the parties, College's first point is denied.

■ College's next point is that the trial court erred in allowing testimony of loss of anticipated profits because the testimony was without foundation and speculative. The most frequently cited case on this issue is *Coonis v. Rogers,* 429 S.W.2d 709 (Mo.Div.1 1968). There, the rule was stated that loss "from the interruption of an established business may be recovered 'where the plaintiff makes it reasonably certain by competent proof what was the amount of his profits' [citation omitted], 'but proof of the income and expenses of the business for a reasonable time anterior to its interruption, with a consequent establishing of the net profits during the previous period, is indispensable [citation omitted].'" *Id.* at 714. In *Coonis,* denial of such an award was made on the basis of lack of evidence of depreciation of equipment, the cost of trash collection, and other gaps in the proof of net profit or loss. *See also, Brown v. McIBS, Inc.,* 722 S.W.2d 337, 341 (Mo.App.E.D.1986), where recovery was denied because the plaintiff "did not present the 'indispensable' proof of net profits generated by McIBS during a reasonable period prior to his dismissal." *See generally,* Annot. 92 A.L.R.3d 1286 (1979).

*Coonis* involved an ongoing business, whereas HCI purchased equipment and supplies in July and August and opened for business on September 10. It then ceased its operation on September 24. As of the time it ceased operations, it had little income and substantial expenses. Thus, HCI did not meet the criteria set by *Coonis.*

To avoid the consequences of the *Coonis* rule, HCI argues that "Missouri Courts have stated that anticipated profits will not be considered too remote and speculative to be recovered where made reasonably certain by proof of actual fact," citing *Orchard Container Corp. v. Orchard,* 601 S.W.2d 299, 305 (Mo.App.E.D.1980). Such a statement is in *Orchard,* but immediately following it is the quotation from *Coonis* requiring "proof of the income and expenses of the business for a reasonable time anterior to its interruption." *Orchard*

does not aid HCI, for in *Orchard,* not only is there the *Coonis* requirement, but also the plaintiff's evidence was from its books and records for approximately three years.

HCI also refers us to two other cases, *Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Management, Inc.,* 519 F.2d 634 (8th Cir.1975), and *Handi Caddy, Inc. v. American Home Products Corp.,* 557 F.2d 136 (8th Cir.1977). *Lakota* involved a one-time fund raising campaign. The court acknowledged that "Iowa law does recognize the 'new business rule' under which potential profits from an untried enterprise are deemed too speculative to afford a basis for recovery." The *Lakota* court distinguished its case from that Iowa law because the fund raising campaign was a single venture, rather than a general business enterprise. *Handi Caddy,* although involving facts arising in Missouri, did not cite *Coonis.* Instead, that court relied primarily on *Anderson v. Abernathy,* 339 S.W.2d 817 (Mo.Div. 1 1960), saying that anticipated profits may be recovered, quoting *Anderson,* when "they are made reasonably certain by proof of actual facts, with data for a rational estimate of their amount." Although the *Handi Caddy* court quoted that clause from *Anderson,* it failed to quote the next sentence in *Anderson,* which is "There is a recognized exception to this rule in the case of an established business, in which case loss from interruption of the business may be recovered 'where the plaintiff makes it reasonably certain by competent proof what was the amount of his profits' [citation omitted], but proof of the income and expenses of the business for a reasonable time anterior to its interruption, with a consequent establishing of the net profits during the previous period, is indispensable." *Anderson, supra,* at 824. In *Anderson,* the court said there was no established business, it had been in operation only three or four months, and there was not sufficient proof to meet the requirements previously established. Thus, the cases cited by HCI are of little aid to its position.

HCI asked Lowder for his opinion as to what the enrollment would be for the exercise classes, based on (1) HCI continuing its activities for the 1983–84 school year; (2) his educational background and experience (B.S. in physical education, M.S. in Education, 33 years teaching); and (3) his contact with potential or actual customers of HCI. Over an objection of lack of foundation and speculation for the opinion, he responded 60 to 70 persons at the time the fall semester ends, 110 to 120 at the end of the spring semester, and 60 to 70 at the end of the summer term. He was referring to both paying participants and students. Thereafter, he clarified that the fall figures did not include students, that the spring total included 25% students, and the summer did not include students. He then identified a rate sheet "indicating a breakdown in fees that were proposed for the fall." He was then asked what percentage would enroll in a full program and what percentage for weight training only. In response to an objection of no foundation and speculative, the trial court said "Isn't this speculative?" After a colloquy, the trial court said "I'm giving you a long leash on this so far" and, on assurances that this was the last question on the subject, allowed HCI to proceed. Lowder responded, "About 75 percent would probably take the full and something like 25, 30, would take just the weights."

Frederick Raines, an associate professor of economics at Washington University, testified that he reviewed HCI's business expenses incurred while in operation. Based on these business expenses, he projected expenses for the year of $20,305. He then referred to an exhibit, which was never received in evidence, which contained certain enrollment figures comparable to those estimated by Lowder, and did calculations to project income of $23,625. He concluded there would be gross profits of $3320 for the year.

The evidence offered by HCI does not meet the standards required in *Coonis, Brown,* or *Anderson.* Raines' testimony did not establish the income and expenses of HCI before its interruption, with an indication of net profits at that time. Also, his assumption concerning expenses did not include the cost to HCI to construct the fitness trail at the college, which was required by the agreement. There is insuffi-

cient evidence in the record to support the jury's verdict.

■ College's final point is that the trial court erred in permitting testimony about HCI's lost value as an ongoing business. The testimony referred to is that of Raines, who said that a firm has a value based "on the projected stream of current and future profits." He arrived at this value by assuming that HCI would at least make $3320, the amount computed for the first year, in future years. He selected a five-year period, because the fitness equipment had been assigned five years for depreciation purposes.

The difficulty with this testimony arises from the fact that HCI only had a one-year agreement with the college. The trial court, outside the hearing of the jury near the end of Raines' direct examination, commented that Meyers' testimony "was that her agreements were for a year; wasn't for any longer period of time than that." Since HCI had no agreement to stay at the college for more than one year, it was not entitled to any lost value as an ongoing business. Further, we have already ruled that the evidence was insufficient for Raines to express an opinion on lost profits for the first year; his five year calculation is premised on the first year lost profits.

The jury found a contract and the breach thereof, and also determined that College was liable to HCI for the breach of contract. The errors requiring reversal affect only the issue of the amount of damages, and only that issue should be retried. *Hotchner v. Liebowits*, 341 S.W.2d 319, 332 (Mo.App.E.D.1960); *Spalding v. Robertson*, 206 S.W.2d 517, 523 (Mo.Div. 1 1947).

The judgment is reversed and the cause remanded with directions to retry only the issue of the amount of damages and to enter judgment for the amount so determined.

SIMON, P.J., and CRANDALL, J., concur.